LITHUANIAN COMMERCE CORPORATION, LTD., Plaintiff,

v.

SARA LEE HOSIERY, Sara Lee Hosiery International, Sara Lee International and Sara Lee Corporation, Defendants,

v.

Algis VASYS and Laima Zajanckauskiene, Additional Counterclaim Defendants.

No. CIV. A. 96–1949.

United States District Court, D. New Jersey.

June 29, 1998.

Gregory D. Saputelli, James R. Thompson, Obermayer, Rebmann, Maxwell & Hippel, Haddonfield, NJ, for Lithuanian Commerce Corporation Ltd., Algis Vasys and Laima Zajanckauskiene

Diane E. Brehm, Ballard, Spahr, Andrews & Ingersoll, Camden, NJ, Carl W. Hittinger, Lance Lewis, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, PA, for Sara Lee Hosiery, Sara Lee Hosiery International, Sara Lee International, and Sara Lee Corporation.

454

## OPINION

ORLOFSKY, District Judge:

This acrimonious dispute arises out of a commercial transaction between an American pantyhose manufacturer and its Lithuanian distributor. The distributor, Lithuanian Commerce Corporation, Ltd. ("LCC"), alleges that the manufacturer, Sara Lee Hosiery, Sara Lee Hosiery International, Sara Lee International, and Sara Lee Corporation (collectively "Sara Lee"), donated a large volume of pantyhose to an international relief organization which distributed them to nations neighboring Lithuania. Through black marketeers, these pantyhose flooded the Lithuanian market at artificially low prices.

LCC complained to Sara Lee about the effects of this donation on LCC's business, and threatened litigation. After protracted negotiations, LCC agreed to release any claims arising out of this donation in exchange for a large quantity of free pantyhose manufactured by Sara Lee in Mexico. Sara Lee allegedly represented that the Mexican pantyhose were the equivalent of the pantyhose manufactured by Sara Lee in America. According to LCC, however, the Mexican pantyhose were not only different from Sara Lee's American pantyhose but were, in fact, defective.

LCC filed this action against Sara Lee invoking the jurisdiction of this Court pursuant to 28 U.S.C. § 1332, as well as 28 U.S.C. § 1331 and 15 U.S.C. § 1125(a). Sara Lee counterclaimed against LCC and two of LCC's principals, Algis Vasys and Laima Zajanckauskiene.[1] Currently pending before the Court are: (1) an appeal from an order of a magistrate judge denying Sara Lee's motion to exclude expert testimony at trial; (2) LCC's motion for partial summary judgment; and (3) Sara Lee's cross-motion for summary judgment.

Amidst the copious and contentious pretrial sorties which have characterized this litigation, Sara Lee moved to exclude the critical testimony of six of LCC's expert witnesses. The magistrate judge granted the motion as to three of LCC's experts, but found the opinions of the remaining three to be admissible at trial. Sara Lee has appealed to this Court from Judge Rosen's denial of its motion to exclude the testimony of LCC's economic expert and evidence concerning certain tests of two experts on pantyhose quality. This appeal requires me to evaluate

---

**1.** Although Sara Lee denominated Vasys and Zajanckauskiene as "Third–Party Defendant[s]," *see* Sara Lee's Counterclaim and Third–Party Complaint at ¶¶ 8, 9, they are properly before this Court only as counterclaim defendants because their liability is not derivative of Sara Lee's liability to LCC. *Compare* Fed.R.Civ.P. 13(h) *with* Fed.R.Civ.P. 14(a); *see, e.g., Federal Deposit Insurance Corp. v. Bathgate,* 27 F.3d 850, 873 (3d Cir.1994). The caption of this matter shall reflect this correction.

the admissibility of expert testimony in light of the Federal Rules of Evidence generally, and the specific standards articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and refined in *General Electric Co. v. Joiner*, —— U.S. ——, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). For the reasons set forth below, I conclude that the magistrate judge based his decision to admit the challenged testimony of LCC's expert witnesses on impermissible grounds and that the opinions of those experts are not admissible at trial.

In addition, LCC has filed a motion for partial summary judgment and Sara Lee filed a comprehensive cross-motion for summary judgment which require me to consider several distinct issues of New Jersey law. For the reasons set forth below, I conclude, among other things, that: (1) as a wholesale distributor purchasing goods for resale, LCC cannot invoke the New Jersey Consumer Fraud Act; (2) New Jersey's economic loss doctrine bars LCC's recovery for defective goods on a theory of negligent misrepresentation; and (3) LCC's receipt of samples from the shipment of Mexican pantyhose did not necessarily preclude LCC's reliance on Sara Lee's alleged misrepresentations regarding the quality of the goods, as required to state a claim of fraud under New Jersey law. I also address LCC's claims of violations of the New Jersey Franchise Practices Act, breach of express and implied warranties, breach of contract and the duty of good faith and fair dealing, tortious interference with contract and with prospective business advantage and violations of the Lanham Act. Ultimately, LCC's motion for partial summary judgment on its claims under the New Jersey Consumer Fraud Act will be denied, and Sara Lee's motion for summary judgment will be granted in part and denied in part as explained below.

## I. APPEAL

Sara Lee has appealed from the partial denial of its motion in limine to exclude the testimony of LCC's proposed expert witnesses. Specifically, Sara Lee objects to the admissibility of the entire analysis conducted by LCC's economic expert and to the admissibility of evidence relating to the "wear" tests conducted by two of LCC's product experts. I conclude that the magistrate judge based his determinations of admissibility on erroneous grounds and, consequently, that decision must be vacated. Rather than remanding these issues for reconsideration by the magistrate judge, however, in the interest of judicial economy, I will withdraw my reference and determine the admissibility of this evidence in the first instance.[2] I find that LCC has failed to demonstrate the reliability, and hence the admissibility, of this proffered expert testimony. Accordingly, Sara Lee's motion to exclude the proffered expert testimony will be granted.

### A. Background of the Appeal

On October 1, 1997, Sara Lee filed a motion in limine to exclude the reports and testimony of six of LCC's proffered expert witnesses. LCC had offered the opinion of: Charles J. Cummiskey as an economic expert on LCC's damages; Nijole Rackiene, Elona Skleriute, Ph.D., and Joseph Zimmerman, Ph.D., as experts on pantyhose quality and the differences between the American and Mexican pantyhose; Eduardas–Antanas Kelbauskas, M.D., as an expert on the use of pantyhose to treat varicose veins; and Gintaras Pukas, Esq., as an expert on Lithuanian law. LCC countered with a cross-motion seeking a declaration that Sara Lee had waived its objections to the testimony of the three Lithuanian experts who had already "testified" in videotaped depositions.[3]

**2.** "It is clear that a district court possesses the authority to withdraw a reference of pre-trial matters to a magistrate judge ... [and i]t appears that the decision rests entirely in the discretion of the district court." *Sheppard v. Beerman,* 822 F.Supp. 931 (E.D.N.Y.1993), *aff'd in part and vacated in part,* 18 F.3d 147 (2d Cir.), *cert. denied,* 513 U.S. 816, 115 S.Ct. 73, 130 L.Ed.2d 28 (1994); *see Burton v. R.J. Reynolds*

*Tobacco Co.,* 177 F.R.D. 491, 499 (D.Kan.1997) (withdrawing reference from magistrate judge with respect to a single evidentiary issue "[i]n the interest of judicial economy").

**3.** Other motions were also considered by the magistrate judge in the same opinion and order, but they are not part of the pending appeal.

These motions were referred to the Honorable Joel B. Rosen, United States Magistrate Judge, who convened a hearing on these matters. On December 4, 1997, after two days of testimony and additional briefing which supplemented an already daunting evidentiary record, Judge Rosen filed a 79 page opinion and an order granting Sara Lee's motion to exclude evidence pertaining to the expert opinions of Zimmerman, Kelbauskas and Pukas, but denying Sara Lee's motion with respect to the testimony of Skleriute, Rackiene and Cummiskey. *See Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery* ("*Sara Lee*"), 177 F.R.D. 245, 253–75 (D.N.J. 1997). Judge Rosen also ruled that Sara Lee had not waived its objections to the videotaped depositions of the Lithuanian experts. *See id.* at 275–76.

On December 18, 1997, Sara Lee filed a notice of appeal from the portion of Judge Rosen's decision denying Sara Lee's motion to exclude the expert testimony of Cummiskey, and evidence pertaining to the wear tests conducted by Skleriute and Rackiene. LCC has not appealed from any aspect of Judge Rosen's opinion and order.

## B. Legal Standards

### 1. Standard of Appellate Review

■ I review a magistrate judge's evidentiary determinations regarding expert testimony, even where they may ultimately affect the outcome of a claim or defense, as non-dispositive orders entered pursuant to 28 U.S.C. § 636(b)(1)(A). *See Ferriso v. Conway Organization*, 1995 WL 580197, *1 (S.D.N.Y. Oct. 3, 1995) (K. Wood, J.); *Jesselson v. Outlet Associates of Williamsburg, Ltd.*, 784 F.Supp. 1223, 1227–28 (E.D.Va. 1991); *see also General Electric Co. v. Joiner*, — U.S. —, —, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997) (finding that the standard of review for the admission or exclusion of scientific evidence does not vary even where the decision may be "outcome determinative"). Therefore, I will only reverse a magistrate judge's decision if it is "clearly erroneous or contrary to law." *See* 28 U.S.C. § 636(b)(1)(A); Fed.R.Civ.P. 72(a); L. Civ. R. 72.1(c)(1)(A); *see generally Lithuanian*

*Commerce Corp., Ltd. v. Sara Lee Hosiery*, 177 F.R.D. 205, 213–14 (D.N.J.1997).

■ Under this standard, a magistrate judge's factual findings will be disturbed only where, after reviewing the entire record, I am "left with the definite and firm conviction that a mistake has been committed." *Lo Bosco v. Kure Engineering Ltd.*, 891 F.Supp. 1035, 1037 (D.N.J.1995) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). A magistrate judge's legal conclusions, however, will be reviewed *de novo*. *See Haines v. Liggett Group, Inc.*, 975 F.2d 81, 91 (3d Cir.1992); *Lo Bosco*, 891 F.Supp. at 1037. Where the law requires the exercise of discretion, only an abuse of that discretion will be deemed contrary to law. *See Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery*, 177 F.R.D. 205, 214 (D.N.J.1997). Ultimately, the "determination whether to admit or exclude expert testimony will be upheld unless manifestly erroneous." *Waldorf v. Shuta*, 142 F.3d 601, 627 (3d Cir.1998) (quotation omitted).

### 2. Standard for Admissibility of Expert Opinion Evidence

■ The admissibility of expert testimony is governed by the Federal Rules of Evidence. The Rules permit an expert to testify "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." *See* Fed.R.Evid. 702. The Third Circuit has interpreted Rule 702 to require that:

(1) the proffered witness must qualify as an expert by knowledge, skill, experience, training, or education; (2) the expert must testify to scientific, technical, or other specialized knowledge; and (3) the expert's testimony must assist the trier of fact.

*Lauria v. National Railroad Passenger Corp.*, 145 F.3d 593, 596–98 (3d Cir.1998). "The second requirement of Rule 702—that the expert testify to scientific, technical or other specialized knowledge—is intended to ensure the reliability or trustworthiness of the expert's testimony." *United States v. Velasquez*, 64 F.3d 844, 849 (3d Cir.1995); *see Lauria*, 145 F.3d at 598–99.

The Third Circuit has similarly interpreted Rule 703 to require that data underlying an expert's opinion be reliable.[4] *See In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 748 (3d Cir.1994) (Becker, J.), *cert. denied*, 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). The test for reliability is identical under Rules 702 and 703. *See id.* at 749 (finding that Rule 703's standard "is equivalent to Rule 702's reliability requirement" and that "[i]t makes sense that the standards are the same, because there will often be times when both Rule 702 and Rule 703 apply"). Thus, in practice, "[t]he Third Circuit has dispensed with metaphysical distinctions between the two rules." *See JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc.*, 1998 WL 175888, *6 (E.D.Pa. Apr. 15, 1998).

The standard for reliability of expert scientific evidence was the subject of the Supreme Court's seminal decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In that case, the Court concluded that the enactment of the Federal Rules of Evidence superseded the common law "general acceptance" test for admissibility of scientific evidence enunciated in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). Instead, the Court interpreted Rule 703 to require that "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. In order to "establish[ ] a standard of evidentiary reliability," the Court emphasized that an expert's "inference or assertion must be derived by the scientific method" and, therefore, "[p]roposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Id.* at 590, 113 S.Ct. 2786. Accordingly, a court must undertake "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113

S.Ct. 2786. This is a "flexible" inquiry. *See id.* at 594, 113 S.Ct. 2786.

■■ Thus, pursuant to Rule 104(a) of the Federal Rules of Evidence, a court must serve as an evidentiary gatekeeper and make a preliminary determination as to the reliability of expert testimony. *See Daubert*, 509 U.S. at 592; *Paoli*, 35 F.3d at 743, 748. A party seeking to admit the testimony of experts must "demonstrate by a preponderance of evidence that their opinions are reliable." *Id.* at 744; *see Daubert*, 509 U.S. at 592 n. 10; *United States v. Breslin*, 1997 WL 431011, *3 (E.D.Pa. July 15, 1997). The consequences of failing to meet this burden are clear: "If the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded." *Paoli*, 35 F.3d at 748 (quotation omitted).

The Supreme Court recently clarified this principle in *General Electric Co. v. Joiner*, —— U.S. ——, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). The Court found that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Id.*, 118 S.Ct. at 519. In fact, far from precluding the exclusion of evidence, where evidence "is too 'speculative' as a matter of law ... *Daubert* and the Federal Rules of Evidence require that a district court be willing and able to do just that." *Target Market Publishing, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1143 (7th Cir.1998).

**C. Discussion**

Sara Lee has appealed from that portion of Judge Rosen's decision which denied Sara Lee's motion to exclude evidence of Cummiskey's economic analysis and evidence of the wear tests conducted by Skleriute and Rackiene. For the reasons set forth below, the decision of Judge Rosen will be vacated as to

---

**4.** Rule 703 of the Federal Rules of Evidence provides: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If

of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

these issues and Sara Lee's motion will be granted.

### 1. Cummiskey's Economic Analysis

Sara Lee contends that the data underlying Cummiskey's economic analysis lacks the reliability required by *Daubert* and *Joiner*. I agree. I find that Judge Rosen erred in his application of the *Daubert* analysis and his decision will therefore be vacated. Rather than remanding this issue, however, I will recall my reference to Judge Rosen and proceed to evaluate the admissibility of Cummiskey's analysis myself. I conclude that his analysis lacks the reliability required by *Daubert* and the reliability required by the Federal Rules of Evidence. Accordingly, Sara Lee's motion to exclude Cummiskey's report and testimony will be granted.

Cummiskey is LCC's proposed expert on damages. He is a certified public accountant with several advanced degrees and experience in private practice and with the Internal Revenue Service. *See Sara Lee*, 177 F.R.D. at 256. According to Judge Rosen's findings:

> Mr. Cummiskey was retained to calculate damages sustained by LCC as a result of the business it lost following Sara Lee's donation of pantyhose to Russia, and Sara Lee's subsequent provision to LCC of defective L'eggs pantyhose.... Although he did not perform any tests, Mr. Cummiskey projected damages for fifteen and twenty year periods for Estonia, for sixteen and twenty-one year periods for Latvia and for seventeen and twenty-two year periods for Lithuania. In order to complete these calculations, Mr. Cummiskey assumed that LCC had a 10% market share in Estonia, Latvia and Lithuania and that the market share in Lithuania would increase by 1% per year. Also factored into the calculations was the estimation, based upon a report from the National Association of Hosiery Manufacturers regarding women in the United States, that Baltic women consume ten pair of pantyhose per year.

*Id.* at 256–57 (citations omitted).

### a. The Magistrate Judge's Decision

Judge Rosen denied Sara Lee's motion to exclude Cummiskey's testimony and, quoting and citing *Daubert*, explained his decision:

> The court is confident that any perceived defects in Mr. Cummiskey's analysis, underlying data and assumptions, and conclusions are capable of being adequately addressed by Sara Lee's damage expert. In order to err on the side of caution by not excluding what may be testimony helpful to the trier of fact, the broad construction of the admissibility of relevant evidence under [Fed.R.Evid. 401], and in light of the measures available, at trial, i.e. Sara Lee's opportunity to cross-examine the expert, Mr. Cummiskey's testimony as an expert shall be permitted. Consequently, Mr. Cummiskey's report is deemed "shaky, but admissible evidence" which will not serve to mislead or confuse the jury.

*Sara Lee*, 177 F.R.D. at 259 (quoting *Daubert*, 509 U.S. at 596) (citations omitted). In sum, Judge Rosen based his decision on: (1) the broad scope of Rule 401; and (2) the counter-measures available to Sara Lee at trial, such as cross-examination and presentation of rebuttal testimony. *Id.* Neither of these reasons, however, constitutes a valid ground for admitting Cummiskey's testimony.

■ Judge Rosen based his decision in part on Sara Lee's ability to refute the reliability of Cummiskey's testimony by cross-examining Cummiskey and by presenting its own expert testimony. Consequently, Judge Rosen deemed Cummiskey's testimony "shaky, but admissible evidence" within the meaning of *Daubert*. *See id.* The *Daubert* Court did indeed acknowledge that such devices "are the traditional and appropriate means of attacking shaky but admissible evidence." *See Daubert*, 509 U.S. at 596. The Supreme Court clarified, however, that "[t]hese conventional devices, rather than wholesale exclusion ... are the appropriate safeguards *where the basis of scientific testimony meets the standards of Rule 702*." *Id.* (emphasis added). To conclude that evidence is admissible because it is subject to such safeguards is, therefore, circular. Consequently, I find that it was error for Judge Rosen, in exercising his gatekeeping function, to premise his determination of admissi-

bility on Sara Lee's ability to rebut the proffered testimony.

Judge Rosen also relied upon the definition of relevant evidence contained in Rule 401 of the Federal Rules of Evidence. That rule defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See* Fed.R.Evid. 401. The relevance of Cummiskey's testimony, however, is not, and never has been, in dispute.

■ Moreover, the fact that proffered evidence is relevant does not make it admissible. Rule 402 of the Federal Rules of Evidence provides: "All relevant evidence is admissible, *except as otherwise provided ... by these rules.*" Fed.R.Evid. 402 (emphasis added); *see* Fed.R.Evid. 403 (stating that evidence may be excluded "[a]lthough relevant"). Relevance is a necessary, but not sufficient, characteristic of admissible evidence—admissible evidence must also satisfy the requirements of Rules 702 and 703. *See Daubert,* 509 U.S. at 589 ("[U]nder the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."); *see also United States v. Foster,* 939 F.2d 445, 451 (7th Cir.1991) ("[I]f relevant, Rule 702 allows for the admission of expert testimony if the witness is qualified and if the testimony would be helpful to the jury."); *United States v. McBride,* 786 F.2d 45, 49 (2d Cir.1986) (finding that "[t]he admissibility of expert testimony calls for the application of several somewhat overlapping requirements" including relevance under Rules 401 and 402, and reliability under Rule 702); *Kelley v. American Heyer–Schulte Corp.,* 957 F.Supp. 873, 876 (W.D.Tex.1997) (finding that admission of scientific expert testimony depends on four inquiries including "the expert's reasonableness in relying on his facts and data under Rule 703, the relevancy of the expert's testimony under Rules 401–403, and the sufficiency of the expert's methodology under *Daubert* "), *appeal dismissed mem.,* 139 F.3d 899 (5th Cir.1998).

Finally, although never explicitly relying on the difficulties inherent in calculating lost profits as a basis for the admissibility of Cummiskey's analysis, Judge Rosen observed that "the calculation of future loss [sic] profit is, by its nature, somewhat uncertain and unpredictable." *See Sara Lee,* 177 F.R.D. at 259. As the Third Circuit has determined, however, "[a]lthough mathematical exactness is not required, [future earnings] testimony ... must be based upon the proper factual foundation." *Benjamin v. Peter's Farm Condominium Owners Association,* 820 F.2d 640, 643 (3d Cir.1987). Thus, the exclusion of Cummiskey's report and testimony may not rest on the inherent uncertainty of its subject matter.

For these reasons, I conclude that Judge Rosen's explicit reasoning cannot support his conclusion. I must, therefore, vacate the portion of Judge Rosen's order denying Sara Lee's motion to exclude Cummiskey's testimony.

### b. Cummiskey's Testimony is Not Admissible under *Daubert* and *Joiner*

■ The Supreme Court has emphasized that district courts must evaluate proffered expert evidence in the first instance rather than leaving the task for the jury to sort through. *See Joiner,* —— U.S. at ——, 118 S.Ct. at 519; *id.,* 118 S.Ct. at 517 (reaffirming "the 'gatekeeper' role of the trial judge in screening such evidence"); *see also Joy v. Bell Helicopter Textron, Inc.,* 999 F.2d 549, 569 (D.C.Cir.1993) (finding that it was error to admit expert damages testimony which was premised upon one non-speculative earnings estimate and three speculative estimates where "the decision to receive expert testimony was simply tossed off to the jury under a 'let it all in' philosophy" because "we must resist the temptation to answer objections to receipt of expert testimony with the shorthand remark that the jury will give it the weight it deserves"), *modified on other grounds,* 40 F.3d 475 (D.C.Cir.1994).

The Third Circuit has not shied away from excluding expert economic testimony on reliability grounds. *See, e.g., Williams v. Rene,* 72 F.3d 1096, 1101–03 (3d Cir.1995) (reversing admission of expert damages testimony

where, despite significant detail, underlying assumption was "unsupported and speculative"); *Benjamin,* 820 F.2d at 642 ("This Court has required more than speculative opinion when determining damages for prospective earnings loss."); *see also Gumbs v. International Harvester, Inc.,* 718 F.2d 88, 98 (3d Cir.1983).

Cummiskey's prediction of the length of LCC's relationship with Sara Lee rested on the deposition testimony of Vereen Mizelle, the former Assistant Market Manager for Sara Lee who managed the LCC account. *See* Charles J. Cummiskey, *Analysis of Damages Suffered by Lithuanian Commerce Corp. in the matter of Lithuanian Commerce Corp. vs. Sara Lee Corp.* (dated Feb. 12, 1997) ("Cummiskey Rep.") at 11 (citing and discussing Deposition of Vereen Mizelle (dated Jan. 16, 1997) ("Mizelle Dep.") at 284, 295–96). Mizelle was employed by Sara Lee for four and one-half years. *See* Mizelle Dep. at 286. An examination of the cited deposition material reveals the following testimony by Mizelle:

Q: What's the longest term customer you had while you were at Sara Lee?

A: Someone with about 24 years.

Q: Who was that?

A: A customer in Panama. And my two customers, the ones in Alaska and Hawaii were 18, 19, 20 years.

Q: Any others?

A: Less. Unless I began doing the business with them, I didn't necessarily look to see when we started doing business with them. I know that for the other two, because they were large customers and it was always talked about.

*Id.* at 295–96, *cited in* Cummiskey Rep. at 11. To conclude that LCC's distributorship of Sara Lee products would have continued for more than twenty years, Cummiskey combined this testimony with Mizelle's statement that "LCC's performance of its duties as a distributor exceeded the normal level of performance of the other distributors that I supervise." *See* Cummiskey Rep. at 11 (quoting Mizelle Dep. at 284); *see also* Mi-

zelle Dep. at 286 (referring to Vasys as "a better than average distributor").

A close examination of Cummiskey's opinion reveals its inadequate foundation, and I therefore find that Cummiskey's testimony with respect to the predicted length of damages is unreliable and inadmissible. Even Judge Rosen agreed with this conclusion. *See Sara Lee,* 177 F.R.D. at 258–59 (finding that Cummiskey's opinion rested on "unsupported" assumptions). Cummiskey relied on Mizelle's statement that LCC outperformed some other distributors. That statement, however, referred not to LCC's sales performance but to LCC's performance of secondary duties, specifically sharing information and paying its bills on time. *See* Mizelle Dep. at 285. According to Mizelle, the most important factor in the duration of a distributor's relationship with Sara Lee was the consistency of product orders, but Mizelle provided no comparison with LCC on those terms. *See id.* at 289–90. Such "warping" of underlying assumptions cannot support the admissibility of expert testimony. *See Williams,* 72 F.3d at 1102.

Moreover, in relying on Mizelle's testimony that over the years he had dealt with "several" customers which had been doing business with Sara Lee for "as long as" 24 years, and that LCC performed above the average of his current customers, Cummiskey based his conclusion on a direct comparison between logically distinct sets of customers—those with whom Mizelle dealt over his 4.5 year tenure at Sara Lee, and Mizelle's current customers. Finally, two of the distributors upon which Cummiskey based this comparison operated in the domestic market and were therefore not subject, for example, to the taxes, tariffs and import restrictions which faced LCC. *See Sara Lee,* 177 F.R.D. at 259. An opinion of an expert witness need not convince me of its merit, but it must satisfy minimum requirements of reliability. Cummiskey's does not.

Cummiskey relied on several other dubious assumptions in calculating LCC's damages. Cummiskey's assumption "that Baltic women consume approximately ten pair of pantyhose per year is not based on any survey of Baltic women ... [but rather] on a survey of Amer-

ican women and an LCC management conclusion that Baltic women consume less pantyhose per year than women in the United States." *Sara Lee*, 177 F.R.D. at 258. He also assumed, with no apparent basis, that LCC controlled 10% of the relevant markets, that LCC's share of the Lithuanian market would have increased at a rate of 1% annually and that LCC's participation in various markets would last for certain durations. *See id.* at 258; Cummiskey Rep. at 11–12. I find that these assumptions are far too speculative to support the admissibility of Cummiskey's report or testimony. *See generally ADVO, Inc.*, 136 F.3d at 1143 (affirming exclusion of expert report on lost profits from joint business venture based on the report's unsupported assumptions regarding, *inter alia*, the product's penetration into new markets); *see also American Bearing Co., Inc. v. Litton Industries, Inc.*, 540 F.Supp. 1163, 1173 (E.D.Pa.1982) (granting new trial where testimony of damages expert should have been excluded because expert's "estimated market shares were based on his oft repeated assumption that American Bearing was offering a better product, with better service, at a lower price" but "[t]he only support in the record for any of these assumptions is the testimony of [American Bearing's president] that American Bearing generally sold its bearing at a cost 40% lower than that charged by [a competitor] and could deliver faster" and because "there is no evidence in the record that any comparative tests were performed on the two bearings to determine relative superiority in terms of performance or durability"), *aff'd on other grounds*, 729 F.2d 943 (3d Cir.), *cert. denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984). Accordingly, for these reasons, I conclude that Cummiskey's unsupported and unreliable opinions are inadmissible.

In an attempt to justify Cummiskey's opinion, LCC relies upon the rule that "the actual amount of lost profits may be estimated from the facts in evidence, including the inferences to be drawn from them and the probabilities they suggest." *See· Universal Computers (Systems) Ltd. v. Datamedia Corp.*, 653 F.Supp. 518, 527 (D.N.J.1987), *aff'd mem.*, 838 F.2d 1208 (3d Cir.1988). LCC's argument, however, ignores the critical phrase "in evidence" and confuses how a jury may use admissible evidence with what evidence is admissible. The ability to estimate damages "from the facts in evidence" is a far cry from the ability to consider inadmissible evidence. Assuming that *Universal Computers* governs the inferential step from admissible evidence to verdict,[5] the Federal Rules of Evidence nevertheless govern the step from inadmissible evidence to admissible evidence. *See Paoli*, 35 F.3d at 744 n. 10 ("Only after meeting such requirements [of Rules 702 and 703] does the question become whether the methodology produced evidence sufficient to survive summary judgment—in other words whether a reasonable person could believe it."); *see also Benjamin*, 820 F.2d at 643 ("Although mathematical exactness is not required, testimony of post-injury earning capacity must be based upon the proper factual foundation.").

LCC also cites *In re Merritt Logan, Inc.*, 901 F.2d 349 (3d Cir.1990), and *Perini Corp. v. Greate Bay Hotel & Casino, Inc.*, 129 N.J. 479, 610 A.2d 364 (1992). Those cases merely overruled the antiquated, categorical "rule precluding new businesses from recovering any damages for lost profits." *See Merritt*, 901 F.2d at 357; *see also Perini*, 129 N.J. at 509–10, 610 A.2d 364. Other than a quotation from *Universal Computers*, those courts did not address acceptable methods of prov-

5. Even if New Jersey law did provide a lower standard for the admissibility of expert damages testimony, it is not at all clear that such a rule would govern in this Court. Generally, "[i]n diversity cases, the admissibility of expert testimony is governed by the Federal Rules of Evidence." *See, e.g., 1836 Callowhill Street v. Johnson Controls, Inc.*, 819 F.Supp. 460, 462 n. 5 (E.D.Pa.1993) (citing *Salas by Salas v. Wang*, 846 F.2d 897 (3d Cir.1988)). The Third Circuit has specifically applied Rule 702 in the face of conflicting New Jersey law. *See Salas*, 846 F.2d at

906; *see also Paoli*, 35 F.3d at 751 (applying Pennsylvania rule requiring medical experts to testify with a reasonable degree of medical certainty because that requirement constituted "an element of plaintiff's burden of proof" under state law, but noting that "[i]f Pennsylvania's rule were only a standard of admissibility in conflict with Federal Rules of Evidence [702 and 703] ... the Federal Rules of Evidence would govern"). Given my finding that *Universal Computers* does not govern my decision, however, I need not reach this issue.

ing damages and, therefore, do not alter my analysis or my conclusion. Accordingly, I conclude that Cummiskey's testimony is not admissible under the *Daubert* standard.

### c. Cummiskey's Testimony is Not Admissible Even Without Application of the *Daubert* Standard

Judge Rosen applied the *Daubert* standard to Cummiskey's economic analysis despite the growing controversy as to whether *Daubert* applies to the admissibility of non-scientific evidence. *See Sara Lee,* 177 F.R.D. at 257; *compare, e.g., Dancy v. Hyster Co.,* 127 F.3d 649 (8th Cir.1997) (finding that *Daubert* analysis applies to non-scientific evidence), *cert. denied,* — U.S. —, 118 S.Ct. 1186, 140 L.Ed.2d 316 (1998), *with Compton v. Subaru of America, Inc.,* 82 F.3d 1513, 1518–19 (10th Cir.) (finding that *Daubert* analysis applies only to scientific evidence), *cert. denied,* — U.S. —, 117 S.Ct. 611, 136 L.Ed.2d 536 (1996). In *United States v. Velasquez,* 64 F.3d 844 (3d Cir. 1995), the Third Circuit refrained from deciding this issue, but applied *Daubert* to the testimony of a handwriting analyst "in an exercise of caution." *Id.* at 850.

More recently, in *Lauria v. National Railroad Passenger Corp.,* 145 F.3d 593 (3d Cir. 1998), a panel of the Third Circuit stated that the court again had no "need to resolve that controversy." *Id.* at 599 n. 7. Notwithstanding that assertion, however, the court concluded: "Because [the expert's] opinion is based on his observations and familiarity with [railroad maintenance procedures] and is gleaned from years of practical experience, the discipline in this case is so different from a scientific inquiry that we see no need to engage in a detailed analysis regarding the scientific reliability of the proffered opinion." *Id.* Thus, despite the court's statement to the contrary, the Third Circuit has at least determined that *Daubert* is inapplicable in some situations. *Compare id. with Compton,* 82 F.3d at 1518 (declaring that "application of the *Daubert* factors is unwarranted in cases where expert testimony is based solely upon experience or training").

I note that expert economic testimony such as Cummiskey's may better be characterized as relying on scientific methodology than on experience or training, thus warranting the application of *Daubert* even under the Tenth Circuit's rule. Nevertheless, I need not decide whether *Daubert* applies because Cummiskey's testimony would be inadmissible under the Federal Rules of Evidence without consideration of the *Daubert* standard.

Even prior to the Supreme Court's decision in *Daubert,* the Third Circuit had excluded expert damages testimony where it was based on unreliable data and assumptions. *See, e.g., Benjamin,* 820 F.2d at 642; *Gumbs,* 718 F.2d at 98. For the reasons I have discussed above, which relied in part on decisions predating *Daubert, see, e.g., Benjamin,* 820 F.2d at 642; *American Bearing,* 540 F.Supp. at 1173, and in part on the Federal Rules of Evidence directly, I conclude that Cummiskey's opinions are premised on unsupported and speculative assertions. Therefore, I deem his opinions inadmissible even without applying the *Daubert* analysis. For these reasons, Sara Lee's motion in limine to exclude the testimony of Charles J. Cummiskey will be granted.

### 2. The Wear Tests

Sara Lee also appeals from the portion of Judge Rosen's decision denying Sara Lee's motion to exclude evidence pertaining to the wear tests performed by Skleriute and Rackiene. Sara Lee relies primarily on the fact that these experts destroyed much of their underlying data. Judge Rosen based his decision, however, upon Sara Lee's opportunity to cross-examine Skleriute and Rackiene at trial, and to present evidence from its own experts. As with Cummiskey's report and testimony, I find that the availability of these counter-measures is an insufficient justification for the admissibility of flawed expert testimony. Consequently, the decision of Judge Rosen will be vacated. Based on my own consideration of the evidence, Sara Lee's motion to exclude evidence pertaining to these wear tests will be granted.

LCC offered the opinions of Skleriute and Rackiene on pantyhose quality in general and on the differences between the Mexican and American pantyhose in particular. Both of these experts conducted several different tests, but Sara Lee has only appealed the

admissibility of evidence pertaining to "wear" tests. *See, e.g.,* Brief in Support of Sara Lee's Limited Appeal ("Appellants' Br.") at 2 (describing this as a "limited appeal . . . for the narrow purpose of addressing . . . [the] failure to exclude from trial reference to wear tests purportedly performed by LCC's two Lithuanian product experts"). Unfortunately, the record does not contain a comprehensive description of these wear tests. This is because both Skleriute and Rackiene destroyed almost all of their original data and notes. *See generally* Certification of Gregory D. Saputelli, Esq. (dated Mar. 7, 1997) ("Saputelli Cert.") at ¶¶ 2–3.

Judge Rosen determined that the destruction of this evidence was attributable to the failure of Mr. Saputelli, counsel for LCC, to advise these experts of their duties and obligations to the Court under the Federal Rules of Civil Procedure and of the potential consequences of such destruction under the Federal Rules of Evidence. *See Sara Lee,* 177 F.R.D. at 267 (finding that Skleriute destroyed data "not due to any fault of her own, but rather due to the failure of plaintiff's counsel to properly advise her of the requirements under Rule 26 and *Daubert* "); *id.* at 269 (finding that the destruction of Rackiene's data "can again be directly attributed to the failure of plaintiff's counsel to properly advise Ms. Rackiene of her duties pursuant to Rule 26 and *Daubert* "). Nevertheless, Judge Rosen found the expert opinions of Skleriute and Rackiene to be admissible at trial.

Skleriute supervises a "textile garments testing laboratory" in Lithuania, and has received two foreign advanced degrees. *See id.* at 265. She used only thirteen pairs of American pantyhose and thirty-seven pairs of Mexican pantyhose for her wear tests. *See* Deposition of Elona Skleriute, Ph.D. (dated Feb. 4, 1997) ("Skleriute Dep.") at 46–47. She used nine testers, herself and eight of her employees, to wear the pantyhose over a sixteen day period. *See id.* at 47; *Sara Lee,* 177 F.R.D. at 266. Because of the short supply of American pantyhose samples, only three testers actually wore both American and Mexican pantyhose; the others merely observed the American ones worn by those three testers. *See* Skleriute Dep. at 49. Moreover, the limited number of samples meant that the testers did not have access to all sizes of each style of pantyhose. *See id.* at 83, 94.

After the testers had worn the pantyhose, Skleriute orally asked each tester a set of questions to elicit their observations about the pantyhose. The list of questions was destroyed, as were Skleriute's contemporaneous notes of each tester's comments. *See Sara Lee,* 177 F.R.D. at 267. Skleriute never recorded the height, weight or age of the tester, but she later attempted to recall those statistics. *See id.* Skleriute has provided a brief summary of the testers' observations which she prepared from her notes before they were destroyed. *See* Letter from E. Skleriute to A. Vasys (dated Nov. 11, 1996) ("Skleriute Rep.") at attachment titled L'eggs Pantyhose Test Results.

Rackiene works in a supervisory position at a laboratory which tests pantyhose quality, although her degree is in industrial planning. *See Sara Lee,* 177 F.R.D. at 267. Rackiene's wear tests involved her employees wearing approximately eighty-five pairs of Mexican pantyhose. *See* Deposition of Nijole Rackiene (dated Feb. 6, 1997) ("Rackiene Dep.") at 57–58. Rackiene, however, provided no other description of her wear testing methodology. *See Sara Lee,* 177 F.R.D. at 268.

### a. The Magistrate Judge's Decisions

Judge Rosen acknowledged the omissions in both Skleriute's and Rackiene's reports, but nevertheless deemed them admissible. Judge Rosen relied on the same justifications for the admissibility of both reports: (1) the ability of Sara Lee to cross-examine LCC's experts and to present expert testimony in rebuttal; and (2) the fact that these omissions were the fault of LCC's counsel. *See Sara Lee,* 177 F.R.D. at 267, 269–70. As I have already discussed, the Federal Rules of Evidence require that expert testimony pass the threshold of admissibility independent of mechanisms which may aid the jury in weighing such testimony at trial. *See supra* Part I.C.1.a. Again, the availability of such devices cannot support the admissibility of expert testimony.

Moreover, whether LCC's experts or LCC's attorneys are to blame for the unreliability of the expert reports is of no consequence to the requirement that only reliable evidence may be admitted at trial. *Cf. Coleco Industries, Inc. v. Berman,* 567 F.2d 569, 576 & n. 14 (3d Cir.1977) (affirming exclusion of expert testimony based on counsel's failure to disclose it to the court), *cert. denied,* 439 U.S. 830, 99 S.Ct. 106, 58 L.Ed.2d 124 (1978). Judge Rosen apparently relied on the fact that Mr. Saputelli failed to instruct these experts properly and thereby effectively removed LCC's burden of proving the reliability and admissibility of the experts' testimony. Consequently, Judge Rosen's determination of admissibility was erroneous.[6] As with Cummiskey's report and testimony, however, rather than remand this issue to Judge Rosen, in the interest of judicial economy, I will recall the reference and determine the admissibility of Skleriute's and Rackiene's wear tests on the basis of the record before me.

#### b. Skleriute's Wear Tests

■ Judge Rosen acknowledged the rampant deficiencies in the data underlying Skleriute's expert opinion. In describing the information provided by Skleriute, Judge Rosen observed the following:

> The wear tests were conducted with nine test subjects, including Dr. Skleriute, over a sixteen day period. Dr. Skleriute collected data relating to the test subjects and to the tested product and recorded the summarized comments regarding the tested product. She did not record the height, weight and age of each test subject, nor did she prepare and retain a written questionnaire for each test subject to complete. Instead, she verbally asked each test subject a set of questions and incorporated their answers into the summary chart. Finally, Dr. Skleriute admits that her daily notes during the wear test were destroyed after she summarized her findings.

*Sara Lee,* 177 F.R.D. at 266–67 (citations omitted); *see also* Saputelli Cert. at ¶ 2.

Skleriute herself characterized her testing procedures as "an express wearing," whatever that might mean. *See id.* at 49. She explained: "It was a two-week time to receive the quick information. The people involved was [sic] not a big number and they had a lot of products to put on." *Id.* In addition to the obvious deficiencies catalogued by Judge Rosen, Skleriute used only nine testers to test only thirteen pairs of American pantyhose and thirty-seven pairs of Mexican pantyhose. *See* Skleriute Dep. at 46–47.[7] Skleriute herself was one of the testers and the other eight were her employees. *See id.* at 47. Moreover, although all nine testers offered comparisons between the American and Mexican pantyhose, only three actually tested samples of both. *See id.* at 49. Thus, two-thirds of the testers based their comparisons of American and Mexican pantyhose on wearing Mexican pantyhose while only "observing the [American] ones worn by others." *Id.* at 305. Even when the testers actually wore the pantyhose, the size samples were limited so they wore whatever size was available. *See id.* at 83, 94.

---

**6.** Sara Lee also contends that Judge Rosen decided not to exclude the wear tests "on the obvious basis" that such a decision would be outcome determinative in direct contravention of *Joiner.* *See* Appellants' Br. at 3. Unfortunately, no reference to, or implicit reliance on, such reasoning can be discerned from Judge Rosen's comprehensive opinion. Therefore, despite Sara Lee's "insight" into Judge Rosen's unstated thoughts, Judge Rosen's decision will not be vacated on those grounds.

Sara Lee also argues that Judge Rosen's decision must be reversed pursuant to Fed.R.Civ.P. 26(a)(2)(B) which requires the production of underlying data. Judge Rosen determined that Sara Lee did not contest Skleriute's compliance with Rule 26. *See Sara Lee,* 177 F.R.D. at 265–66. Because Judge Rosen's decision will be va-

cated on other grounds, I need not address the doctrines of waiver·and forfeiture of arguments on appeal. *Compare Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery,* 177 F.R.D. 205, 209–12 (D.N.J.1997) (refusing to consider grounds for appeal which were waived before a magistrate judge) *with United States v. Sclafani,* 996 F.Supp. 400, 406–07 (D.N.J.1998) (reviewing order for plain error based on grounds which were forfeited, but not waived, before a magistrate judge).

**7.** LCC itself concedes that 8 pairs of pantyhose "hardly qualifies as a statistically significant sample" upon which to base a conclusion. *See* LCC's Memorandum of Law in Opposition to Sara Lee's Motion for Summary Judgment at 32.

Moreover, in the process of performing these tests, Skleriute destroyed all of her original notes and observations. Skleriute did provide a one or two sentence summary of each tester's observations of each product. *See Sara Lee,* 177 F.R.D. at 267. Skleriute admitted, however, that her summaries merely contained "the concentration of some of the essential things." *See* Skleriute Dep. at 50. I reject this summary as a basis for admitting Skleriute's wear tests for two reasons. First, her use of the term "some" implies that other "essential" things may be missing. Second, LCC cannot predicate the admissibility of Skleriute's opinion on the basis of Skleriute's own opinion as to what observations are "essential." *See Joiner,* — U.S. at —, 118 S.Ct. at 519; *ADVO, Inc.,* 136 F.3d at 1143.

After careful review of Skleriute's report and other evidence in the record, I conclude that LCC has failed to demonstrate the reliability of the data underlying her wear tests and, consequently, of her ultimate opinions. Accordingly, Sara Lee's motion to exclude evidence pertaining to Skleriute's wear tests will be granted.

### c. Rackiene's Wear Tests

██ Rackiene has provided a one page report of her findings in which she concluded that: (1) Mexican Sheer Energy pantyhose did not massage the legs, irritated the skin and were inferior to the American version; (2) all four types of Mexican pantyhose in all three sizes slipped during wear; and (3) all four types of Mexican pantyhose tended to tear. *See* Letter from N. Rackiene to Algis Vasys (dated Nov. 22, 1996) ("Rackiene Rep.") at 1. To support the reliability of these findings, Rackiene has provided a one-half page summary of the test "data." *See id.* at app. ¶ 3. As an example of its brevity, the longest of the four entries in that summary describing Mexican pantyhose provides in full:

> "Nylon Classic" pantyhose, made in Mexico, do not have spandex. Pantyhose slips down from a standard female figure during wear. Sixty percent of all responses were negative because the stretch of the waist

and leg length after wearing was noticed as excessive (sizes A, Q).

*Id.* at app. ¶ 3.5.

Like Skleriute, Rackiene destroyed all of her notes and underlying data after "incorporating" them into this 215-word opus. *See generally* Saputelli Cert. at ¶ 3. Specifically, Rackiene "recorded on 'scrap paper' the comments and responses of the wear test participants to questions that were orally presented to them regarding their opinion of the pantyhose they were wear-testing." *Id.* at ¶ 3(c). No written questionnaire was ever used, much less a standardized one. *Id.* at ¶ 3(d). After incorporating those comments into her summary, Rackiene destroyed those notes. *Id.* at ¶ 3(c), (d). Judge Rosen noted "[t]he failure of Ms. Rackiene to more clearly set forth the methodology for the wear tests" based on, among other things, "the lack of information on the wear test participants' weight, height, activity level, and age." *Sara Lee,* 177 F.R.D. at 270.

Faced with this remarkable dearth of evidence, I am unable to evaluate the reliability of Rackiene's opinions and data by any standard other than her own opinion. I conclude, therefore, that LCC has failed to demonstrate the reliability of Rackiene's opinion. Accordingly, Sara Lee's motion to exclude evidence pertaining to Rackiene's wear tests will be granted.

### D. Conclusion of the Appeal

For the reasons set forth above, the order of Judge Rosen denying Sara Lee's motion in limine to exclude expert testimony will be vacated as to the testimony of Charles J. Cummiskey and evidence pertaining to the wear tests conducted by Elona Skleriute and Nijole Rackiene. In the interest of judicial economy, the reference of this motion will be withdrawn as to those issues, and the motion will be granted as to those issues. The Court will enter an appropriate Order.

## II. SUMMARY JUDGMENT

LCC has moved for partial summary judgment and Sara Lee has cross-moved for summary judgment. These motions require me to interpret several provisions of New Jersey law including the New Jersey Consumer

Fraud Act, the New Jersey Franchise Practices Act, New Jersey's economic loss doctrine and New Jersey's version of the Uniform Commercial Code. For the reasons set forth below, LCC's motion for partial summary judgment will be denied and Sara Lee's cross-motion for summary judgment will be granted in part and denied in part.

### A. Background

Sara Lee "manufactures and markets diverse consumer products throughout the world" and is focusing on increasing its market share in developing countries, including countries in Eastern Europe. *See* Joint Final Pre-trial Order, Stipulated Facts ("Stip.F.") at ¶¶ 7–10. Sara Lee Corporation is a Maryland corporation with its principal place of business in Illinois. *Id.* at ¶ 7. Sara Lee Hosiery, a division of Sara Lee Corporation, has its principal place of business in North Carolina. *Id.* at ¶ 3. Sara Lee Hosiery International is also a division of Sara Lee Corporation with no distinct place of business. *See id.* at ¶ 4. Sara Lee manufactures, and owns the trade names and trademarks for, several L'eggs brand pantyhose products and styles. *Id.* at ¶ 12. During the relevant time periods, Peter L. Hellebush was a vice president of Sara Lee Hosiery, Vereen Mizelle was the Assistant Marketing Manager in charge of the LCC account and Herve Roche was a vice president of Sara Lee's Mexican operations.

LCC is a New Jersey corporation with its principal place of business in Clementon, New Jersey. *Id.* at ¶¶ 1–2. LCC was incorporated in September of 1993 for the purpose of exporting consumer goods and personal care products to Lithuania. *Id.* at ¶¶ 1, 11. On December 3, 1993, Algis Vasys, the Chief Executive Officer of LCC, and Laima Zajanckauskiene, the Chief Operating Officer of LCC, met with Sara Lee representatives in Sara Lee's offices in Winston–Salem, North Carolina, and were provided with Sara Lee promotional materials. *Id.* at ¶ 13. After that meeting, LCC alleges that "Sara Lee verbally granted to LCC, on a trial basis, a distributorship for the L'eggs brand pantyhose, with Lithuania as LCC's exclusive territory." *See* Affidavit of Algis Vasys in support of Order to Show Cause for Preliminary Injunction ("Vasys Aff. I") at ¶ 4.

Also after that meeting, LCC began purchasing L'eggs products from Sara Lee. *See, e.g.,* Stip. F. at ¶ 14. Sara Lee subsequently expanded LCC's territory to include additional Baltic nations. *See id.* at ¶¶ 7, 9. "Since 1994, LCC has engaged in a widespread advertising campaign consisting of television commercial, radio advertisements, billboards, in-store posters, coupons and distributing pamphlets." Stip. F. at ¶ 16.

Less than six months after LCC began purchasing pantyhose from Sara Lee, however, Sara Lee donated a quantity of L'eggs products to a relief organization which provides supplies to the Republic of Belarus and other countries in the Baltic region (the "Russian Donation"). *See* Stip. F. at ¶ 18; Letter from M. Veitenhans to V. Adams (dated June 29, 1994). According to Sara Lee's donation valuation form, Sara Lee donated approximately 260,000 dozen pairs of pantyhose valued at $3,158,554.00. *See* Tax Receipt (dated July 20, 1994).

According to LCC, those pantyhose infiltrated the markets which were subject to LCC's exclusive distributorship, causing LCC's retail customers to cancel orders with LCC in favor of the cheaper product available on the black market. *See, e.g.,* Letter from A. Vasys to V. Mizelle (dated Oct. 24, 1994); Letter from A. Vasys to J. Piazza (dated Dec. 19, 1994); Letter from G. Saputelli to J. Piazza (dated Jan. 24, 1995). LCC alleges that its financial condition and business operations suffered severely as a result of the Russian Donation. *See, e.g.,* Letter from A. Vasys to H. Rosche [sic] (dated Mar. 24, 1995) ("LCC has incurred substantial losses with no prospect to recover same."); Letter from A. Vasys to V. Mizelle (dated May 18, 1995) (stating that "LCC finds itself in a most difficult financial position" and that LCC will be unable to continue operations without assistance from Sara Lee).

According to Sara Lee, the Russian Donation was made by its domestic division without ever informing the international branch. *See* Mizelle Dep. at 273–74; *see also* Letter from L. Porter to G. Saputelli (dated Mar. 16, 1995) ("I have learned that the group

with which [LCC] dealt was unaware of any intention to donate products into Russia at the time they established a relationship with [LCC]. They first learned of the donations through [Vasys'] letter."). Sara Lee also contends that the Russian Donation was "handled with as much care as possible to see that the products were distributed only in the intended manner." *See id.; see also* Letter from M. Veitenhans to V. Adams (dated June 29, 1994) (acknowledging the donation of pantyhose and stating that "the product will be transported on a 'as-needed' basis into various countries of the former Soviet Union").

On September 7, 1994, Mizelle issued a notarized letter advising that LCC "is the only business enterprise authorized to distribute L'eggs pantyhose in the nations of Lithuania and Latvia." *See* Letter from V. Mizelle to whom it may concern (notarized Sep. 7, 1994) ("Mizelle Ltr."); *see also* Memorandum from V. Mizelle to H. Roche re: Diverted L'eggs (dated Oct. 19, 1994). Nevertheless, claiming that Sara Lee's actions had caused severe injuries, LCC raised the specter of litigation. *See, e.g.,* Letter from A. Vasys to J. Piazza (dated Dec. 19, 1994) at 5; Letter from G. Saputelli to L. Porter (dated Mar. 22, 1995).

Eventually, Sara Lee proposed a potential settlement of LCC's claims in exchange for a volume of product at no cost to LCC. On June 7, 1995, Hellebush spoke by telephone with Vasys, who secretly recorded the conversation. *See* Transcript of Telephone Conversation between A. Vasys and P. Hellebush (dated Jun. 7, 1995) ("Tel. Tr."). Hellebush prefaced his "idea" by telling Vasys that "I just got the information as of yesterday, so the data that I have to support it is sketchy, but I will get whatever we need in order to see if this fits the bill." *Id.* at 1. The idea was to give LCC a supply of pantyhose which Sara Lee had in Mexico. Hellebush stated: "The specs are exactly the same as they are in the U.S." *Id.* at 2; *see* Mizelle Dep. at 197, 217–18, 219 ("I was assuring [Vasys] that it was the same as U.S. products based on what I had been told. That's certainly what I believed.").

Hellebush did not know the mix of brands in the Mexican inventory. *Id.* He did "know that a good slug of it is spandex product," but warned that "I can't quantify good slug right now." *Id.* According to Hellebush's proposal, LCC would be responsible for transporting and, if necessary, repackaging the pantyhose. *Id.* at 1–2. LCC would also be responsible for marketing efforts, especially for building and expanding its distribution base. *Id.* at 3, 9. Contending that television advertising was necessary to create enough demand to move the Mexican inventory, Vasys requested a $20,000.00 interest-free loan for six months and Hellebush promised to look into the possibility. *Id.* at 6–7. The conversation concluded with mutual statements that such a deal would settle LCC's claims without litigation. *Id.* at 7, 10. Vasys confirmed his recollection of this conversation by letter that same day. *See* Letter from A. Vasys to P. Hellebush (dated June 7, 1995). Hellebush responded by letter that his memory differed from Vasys' recollection. *See* Letter from P. Hellebush to A. Vasys (undated).

In response to Vasys' request, he was sent eight samples of the Mexican pantyhose. *See, e.g.,* Facsimile from S. Ortiz (dated June 20, 1995) (attaching other documentation). Vasys acknowledged receipt of the samples, and requested English translations of the information printed on the packaging. *See* Facsimile from A. Vasys to I. Maldonado (dated June 23, 1995). Vasys testified that his only use for the samples was "to look at the graphics of the box." *See, e.g.,* Deposition of Algis Vasys (dated Dec. 4, 1996) at 160. Mizelle corroborated that testimony. *See* Mizelle Dep. at 200, 231, 245; *see also* Affidavit of Vereen Mizelle (dated May 2, 1996) at ¶ 8.

"On July 7, 1995, the parties signed a letter agreement to resolve LCC's claims whereby Sara Lee would give to LCC 34,825 dozens (417,900 pairs) of L'eggs brand pantyhose manufactured by Manufacturas Mallorca de Mexico. Pursuant to this agreement, LCC was obligated to pay transportation costs associated with shipping the Mexican manufactured pantyhose to Lithuania." Stip. F. at ¶ 19; *see* Letter Agreement between A.

Vasys and V. Mizelle (dated Jul. 7, 1995). That agreement purported to "releas[e] and discharg[e] [Sara Lee] from any claim, demand, or cause of action LCC may have now or in the future growing out of any matter or dispute whatsoever related to any act or event occurring up to or through the date of this letter." *Id.* at 2. The agreement concluded with the phrase: "Great! Now let's build a market!" *Id.*

After distributing the Mexican pantyhose to retailers, however, LCC began to receive reports of severe dissatisfaction from its customers. *See* Vasys Aff. I at ¶¶ 22, 24; Letter from A. Vasys to P. Hellebush (dated Dec. 15, 1995); *see also* Deposition of Irena Pivoriuniene (dated Feb. 11, 1997). Vasys engaged three female "models" to wear test the Mexican pantyhose who "all concluded that the Mexican product was not 'L'eggs.'" Vasys Aff. I at ¶ 25. LCC eventually engaged product experts to test the quality of the Mexican pantyhose as compared with the American pantyhose. *See generally Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery,* 177 F.R.D. 245 (D.N.J.1997); *see also supra* Part I. On April 29, 1996, LCC filed this action.

### B. Summary Judgment Standard

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "In deciding whether there is a disputed issue of material fact, the Court must view all inferences, doubts and issues of credibility in favor of the non-moving party." *Van de Zilver v. Rutgers University,* 971 F.Supp. 925, 931 (D.N.J.1997) (citing *Hancock Industries v. Schaeffer,* 811 F.2d 225, 231 (3d Cir.1987)). Thus, a court must first determine whether "any genuine factual issues [exist] that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Moreover, where the moving party supports its position, the non-moving party must offer evidence to rebut the claim. *See* Fed. R.Civ.P. 56(e). According to that rule:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

*Id.* Essentially, a court will grant summary judgment on an issue where: (1) the moving party has provided support for its position; and (2) the non-moving party has failed to offer evidence to show that a question of material fact remains. *See Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### C. Discussion

LCC has moved for summary judgment on one count of its Amended Complaint and Sara Lee has filed a cross-motion for summary judgment on all counts of LCC's Amended Complaint. Sara Lee has not moved for summary judgment with respect to its counterclaims. For the reasons set forth below, LCC's motion for partial summary judgment will be denied and Sara Lee's cross-motion for summary judgment will be granted in part and denied in part.

#### 1. New Jersey Consumer Fraud Act

Sara Lee and LCC have each moved for summary judgment on LCC's claims under the New Jersey Consumer Fraud Act ("NJCFA"). That act provides in relevant part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent perfor-

mance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J.S.A. 56:8–2.

The NJCFA provides a private right of action for any "person" who is harmed by such an unlawful practice, *see* N.J.S.A. 56:8-19, and defines the term "person" to include, among others, "any ... corporation, company, trust, business entity or association," *see* N.J.S.A. 56:8–2(d). The NJCFA, however, "does not regulate sales that cannot be considered sales to consumers as that term is commonly understood." *See R.J. Longo Construction Co., Inc. v. Transit America, Inc.,* 921 F.Supp. 1295, 1311 (D.N.J.1996). Sara Lee contends that LCC cannot sue under this provision because LCC is not a consumer.

Under the NJCFA, "it is the character of the transaction rather than the identity of the purchaser which determines if the Consumer Fraud Act is applicable." *J & R Ice Cream Corp. v. California Smoothie Licensing Corp.,* 31 F.3d 1259, 1273 (3d Cir.1994) (finding that the purchase of a franchise cannot fall within the ambit of the NJCFA "because they are businesses, not consumer goods or services" and, therefore, "[t]hey never are purchased for consumption"). Thus, "[i]t is clear that a corporation may qualify as a person within the Act when it finds itself in a consumer oriented situation." *BOC Group, Inc. v. Lummus Crest, Inc.,* 251 N.J.Super. 271, 277, 597 A.2d 1109 (Law Div.1990); *accord J & R Ice Cream,* 31 F.3d at 1273.

I note at the outset that one business' release of claims against another in exchange for inventory is hardly a typical consumer oriented situation. This is consistent with a technical analysis of LCC's claims. In *Hundred East Credit Corp. v. Eric Schuster Corp.,* 212 N.J.Super. 350, 515 A.2d 246 (App. Div.), *certif. denied,* 107 N.J. 60, 61, 526 A.2d 146 (1986), the court adopted a "frequently ... used" definition of a consumer as: "one who uses (economic) goods, and so diminishes

or destroys their utilities." *Id.* at 355, 515 A.2d 246.

Applying this definition, courts have consistently concluded that purchasers of wholesale goods for resale are not consumers within the meaning of the NJCFA. *See Conte Brothers Automotive, Inc. v. Quaker State–Slick 50, Inc.,* 992 F.Supp. 709, 716 (D.N.J. 1998) (finding that "commercial resellers such as plaintiffs [who purchased merchandise from defendants for resale] do not qualify as 'consumers'"); *Windsor Card Shops, Inc. v. Hallmark Cards, Inc.,* 957 F.Supp. 562, 567 n. 6 (D.N.J.1997) ("Windsor purchased the goods at wholesale to sell to its store customers. Windsor did not diminish or destroy the utility of the goods. Thus, Windsor cannot sue as a consumer of goods under NJCFA."); *City Check Cashing, Inc. v. National State Bank,* 244 N.J.Super. 304, 309, 582 A.2d 809 (App.Div.) ("In the transaction here, plaintiff essentially was buying cash from defendant at wholesale to sell to its check-cashing customers at retail. Plaintiff did not diminish or destroy the utility of the cash and therefore did not consume it. Thus ... plaintiff is not a consumer protected by the Act."), *certif. denied,* 122 N.J. 389, 585 A.2d 391 (1990).[8]

The cases cited by LCC are generally consistent with this principle. *See, e.g., Coastal Group, Inc. v. Dryvit Systems, Inc.,* 274 N.J.Super. 171, 643 A.2d 649 (App.Div.1994) (finding that developer and owner of a condominium project could sue under the NJCFA for claims related to its purchase of building materials for construction of its own condominiums); *Dreier Co., Inc. v. Unitronix Corp.,* 218 N.J.Super. 260, 527 A.2d 875 (App. Div.1986) (finding that seller and distributor of sporting goods could sue under the NJCFA for claims relating to its purchase of a computer system for use in billing, accounting and inventory control). One anomalous sentence in one recent decision from the Appellate Division of the New Jersey Superior Court, however, must be addressed. *See Marascio v. Campanella,* 298 N.J.Super. 491, 689 A.2d 852 (App.Div.1997).

---

**8.** Although the Third Circuit has cautioned that "some consumer goods may not be diminished or destroyed through use," *see J & R Ice Cream,*

31 F.3d at 1274 n. 14, the pantyhose products at issue here are clearly consumer goods.

In *Marascio,* the court observed that "a consumer transaction occurs when the transaction involves the sale of consumer goods regardless of who purchases those goods and for what purpose." *Id.* at 497, 689 A.2d 852 (citing N.J.S.A. 56:8–1(c)). The (sole) citation to the NJCFA's definition of "merchandise," and the context of the court's discussion as to whether a part residential and part commercial building qualifies as merchandise under the NJCFA, suggest that the court may have intended to speak only to the meaning of that term. The proposition that any and all purchasers of consumer goods could sue under the NJCFA, on the other hand, would contradict the New Jersey legislature's specific efforts to define "person" under the NJCFA. *See* N.J.S.A. 56:8–1(d). Accordingly, to the extent that *Marascio* purports to eviscerate the extensive body of law defining consumers under the NJCFA, as well as the statutory definition of person, I find that the New Jersey Supreme Court would disagree. *See J & R Ice Cream,* 31 F.3d at 1271 (declining to follow Appellate Division decision in the face of "indications that the Supreme Court of New Jersey would not adopt the reasoning . . . or apply the result" of the lower court decision).

Consequently, I will follow the well-reasoned authorities which have determined that purchasers of wholesale goods for resale are not the consumers who may invoke the protections of the NJCFA. LCC has stipulated that it operates as "a wholesaler, not a retailer." *See* Stip. F. at ¶ 27. I conclude therefore that LCC's purchase of pantyhose from Sara Lee for resale was not a consumer transaction within the purview of the NJCFA. Accordingly, LCC's motion for summary judgment on its NJCFA claims will be denied and Sara Lee's cross-motion for summary judgment on those claims will be granted.

#### 2. New Jersey Franchise Practices Act

■ Sara Lee has moved for summary judgment on LCC's claims under the New Jersey Franchise Practices Act ("NJFPA") on the ground that the NJFPA is not applicable to the relationship between Sara Lee and LCC. The NJFPA applies only to a "franchise," *see* N.J.S.A. 56:10–4, which it defines as:

> a written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.

N.J.S.A. 56:10–3a. Moreover, the NJFPA applies only to such an arrangement "the performance of which contemplates or requires the franchisee to establish or maintain a place of business with the State of New Jersey." *See* N.J.S.A. 56:10–4a. Thus, "[a] franchise exists under the NJFPA if: (1) there is a 'community of interest' between the franchisor and the franchisee; (2) the franchisor granted a 'license' to the franchisee; and (3) the parties contemplated that the franchisee would maintain a 'place of business' in New Jersey." *Cooper Distributing Co., Inc. v. Amana Refrigeration, Inc.,* 63 F.3d 262, 268–69 (3d Cir.1995).

#### a. Writing

■ Sara Lee first contends that LCC lacks a written agreement as required by the NJFPA. LCC relies upon two notarized letters signed by the Assistant Market Manager of Sara Lee Hosiery International. The first states:

> Please be advised by this letter that [LCC] is the only business enterprise authorized to distribute L'eggs pantyhose in the nations of Lithuania and Latvia.

> This instrument is drafted by Sara Lee Hosiery, the owner of the L'eggs brand name and manufacturer of said pantyhose.

*See* Letter from Vereen Mizelle to whom it may concern (notarized Sept. 7, 1994). The second letter states that LCC "is the sole authorized distributor of Leggs [sic] pantyhose for Sara Lee Hosiery International Trading Company for" Lithuania, Latvia, Estonia and the District of Kaliningrad. *See* Letter from Vereen Mizelle to whom it may concern (notarized Aug. 23, 1995). These letters suffice to raise a factual issue as to whether LCC had a written agreement with Sara Lee.

### b. License

Sara Lee argues that it never granted LCC a license as contemplated by the NJFPA. "Before a party may be deemed a franchisee subject to the Act's protections, it must show that it had been granted 'a license' to use a trade name, trade mark, service mark, or related characteristic[ ]." *Instructional Systems, Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 351, 614 A.2d 124 (1992) (quoting N.J.S.A. 56:10–3a). To be licensed under the NJFPA means "to use as if it is one's own" and such a license "implies a proprietary interest." *See Cooper Distributing*, 63 F.3d at 272 (quoting *Finlay & Associates, Inc. v. Borg–Warner Corp.*, 146 N.J.Super. 210, 219, 369 A.2d 541 (Law Div. 1976), *aff'd on other grounds*, 155 N.J.Super. 331, 382 A.2d 933 (App.Div.), *certif. denied*, 77 N.J. 467, 391 A.2d 483 (1978)); *accord Instructional Systems*, 130 N.J. at 352, 614 A.2d 124. "At a minimum, the term 'license' means that the alleged franchisee must use the name of the franchisor in such a manner as to create a reasonable belief on the part of the consuming public that there is a connection between the ... licensor and licensee by which the licensor vouches, as it were, for the activity of the licensee." *Instructional Systems*, 130 N.J. at 352, 614 A.2d 124 (quotation omitted).[9]

LCC relies upon the affidavits of its president describing the relationship between LCC and Sara Lee. According to Vasys:

In connection with LCC's sales efforts in the Baltics, LCC established a common identity with Sara Lee by utilizing numerous promotional devices bearing the L'eggs brand name, including but not limited to: a van prominently displaying the LCC name alongside a L'eggs poster affixed to the side and back of the van; LCC billboards featuring a picture of L'eggs pantyhose and bearing the L'eggs name, which were displayed on buildings in the Baltics and at tennis tournaments; and LCC brochures picturing and describing L'eggs brand pantyhose, with the L'eggs name prominently displayed.

Affidavit of Algis Vasys (dated Nov. 5, 1997) ("Vasys Aff. II") at ¶ 9; *see* Vasys Aff. I at ¶¶ 4–6. Based on this evidence, a reasonable jury could find that this conduct would "create a reasonable belief on the part of consuming public that there is a connection between the ... licensor and licensee by which the licensor vouches, as it were, for the activity of the licensee" and thus that LCC had a license within the meaning of the NJFPA. *See Instructional Systems*, 130 N.J. at 352, 614 A.2d 124.[10]

### c. Community of Interest

Sara Lee contends that its arrangement with LCC did not encompass a "community of interest" as required by the NJFPA. "Community of interest exists when the terms of the agreement between the parties or the nature of the franchise business re-

---

9. The statutory definition of a franchise would appear to require that the license appear in the written arrangement. *See* N.J.S.A. 56:10–3a (defining franchise as "a written arrangement ... *in which* a person grants ... a license") (emphasis added); *see also Colt Industries, Inc. v. Fidelco Pump & Compressor Corp.*, 700 F.Supp. 1330, 1335–36 & n. 5 (D.N.J.1987), *aff'd*, 844 F.2d 117 (3d Cir.1988). Nevertheless, when interpreting that term, the Third Circuit and the New Jersey Supreme Court have consistently contemplated conduct beyond the confines of the written agreement. *See, e.g., Instructional Systems*, 130 N.J. at 352, 614 A.2d 124 (defining "license" in terms of "a reasonable belief on the part of the consuming public"); *Cooper Distributing*, 63 F.3d at 272 (holding that "a reasonable jury could have inferred the existence of a 'license' based on various aspects of the lengthy ... relationship" between the parties). Therefore, I must do the same.

10. Relying on a 1976 New Jersey trial court decision, Sara Lee implies that LCC was not licensed under the NJFPA because LCC used its own name. *See* Sara Lee's Memorandum of Law in Opposition to LCC's Motion for Partial Summary Judgment and in Support of Sara Lee's Motion for Summary Judgment ("Sara Lee's Mem.") at 22 (citing *Finlay*, 146 N.J.Super. at 219, 369 A.2d 541). Sara Lee's position has been squarely rejected by the New Jersey Supreme Court. *See Instructional Systems*, 130 N.J. at 354–55, 614 A.2d 124 (finding that "the inclusion of independently named businesses is implicit in the Act's definition of franchise"); *see also Cooper Distributing*, 63 F.3d at 273 n. 13 ("The New Jersey Supreme Court has expressly held that independently-named franchisees may still have a license from the franchisor.").

quires the licensee, in the interest of the licensed business's success, to make a substantial investment in goods or skills that will be of minimal utility outside the franchise." *Instructional Systems,* 130 N.J. at 359, 614 A.2d 124 (quoting *Cassidy Podell Lynch, Inc. v. SnyderGeneral Corp.,* 944 F.2d 1131, 1143 (3d Cir.1991)). This reserves the protections afforded by the NJFPA for franchisees which must accede even to unreasonable demands of a franchisor because "the franchisee cannot do anything that would risk termination, because that would result in a loss of much or all of the value of its franchise-specific investments." *See Instructional Systems,* 130 N.J. at 357, 614 A.2d 124. "Thus, in order to find a 'community of interest,' two requirements must be met: (1) the distributor's investments must have been 'substantially franchise-specific;' and (2) the distributor must have been required to make these investments by the parties' agreement or the nature of the business." *Cooper Distributing,* 63 F.3d at 269 (citation omitted).

LCC contends that it made franchise-specific investments "in inventory purchases, computer equipment and a van," as well as in customer good will. *See* LCC's Memorandum of Law in Opposition to Sara Lee's Motion for Summary Judgment ("LCC's Mem.") at 28. It is difficult to imagine how computer equipment and a van could only be used with respect to Sara Lee products. *See Cooper Distributing,* 63 F.3d at 271 (finding that computer system "would clearly be useful outside the [franchise] context"). Whether investments in inventory are sufficient to support a community of interest remains an open question. *See id.* at 271 n. 8 (declining to decide "whether Cooper's investment in Amana inventory ... w[as] franchise specific"). I need not decide whether these investments are franchise-specific, however, because I find that LCC has provided evidence of franchise-specific investments in customer goodwill sufficient to preclude summary judgment on this issue.

"It is clear that goodwill can constitute a franchise-specific asset" where it is "useful for the alleged franchisee only in the context of its relationship with the alleged franchisor." *Id.* at 270. LCC has provided evi-

dence from which a reasonable jury could find that LCC invested in promotional and marketing activities specifically linked to Sara Lee and L'eggs brand pantyhose. LCC promoted Sara Lee's products under the LCC and L'eggs names jointly. *See, e.g.,* Vasys Aff. I at ¶ 6; Vasys Aff. II at ¶ 9. Moreover, by late 1994, "LCC had begun to focus its resources, activities and efforts almost exclusively (at least 95%) on the L'eggs line of products, and ceased virtually all other business operations and product sales unrelated to L'eggs products." *See* Vasys Aff. I at ¶ 10; *compare Instructional Systems,* 130 N.J. at 358, 614 A.2d 124 (finding that goodwill cannot create a community of interest where a distributor sells many brands and its "goodwill investments are not intimately tied to [any one] manufacturer and therefore lack the economic character of genuine franchise investments"). I find that a reasonable jury could conclude that LCC made substantially franchise-specific investments in goodwill.

#### d. New Jersey Place of Business

Sara Lee contends that LCC's NJFPA claims are barred by its lack of a place of business in New Jersey. The NJFPA "applies only to a franchise the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey." *See* N.J.S.A. 56:10–4a. A "place of business" is defined by the NJFPA as "a fixed geographical location at which the franchisee displays for sale and sells the franchisor's goods" but does not mean "an office, a warehouse, a place of storage, a residence or a vehicle." *See* N.J.S.A. 56:10–3f. The latter prohibition "ensures that only those businesses that operate as genuine franchises will obtain the protection of the Act." *See Instructional Systems,* 130 N.J. at 349, 614 A.2d 124. Thus, "there must be a sales location in New Jersey. Mere distribution through an office or warehouse would not qualify." *See id.* (quotation omitted). The statute does not, however, require that any sales actually be consummated at the place of business. *See Cooper Distributing,* 63 F.3d at 274–75.

In *Cooper Distributing,* the Third Circuit found that a distributor demonstrated that

its "showroom/marketing center" constituted a place of business under the NJFPA where there was "ample evidence in the record that [the distributor] regularly used this facility for activities that were an integral part of the sales process." *See id.* at 274. According to Vasys, LCC displayed L'eggs pantyhose in its New Jersey office where they were viewed by sales representatives. *See* Vasys Aff. II at ¶¶ 5–6. Two particular sales representatives visited LCC's New Jersey office "for the purpose of viewing the L'eggs pantyhose on display" and, while there, "engaged in lengthy discussions with LCC regarding the possibility on purchasing L'eggs pantyhose from LCC." *See id.* at ¶ 7. This evidence creates a genuine issue as to whether LCC's New Jersey office was a place of business within the meaning of the NJFPA. Consequently, for these reasons, Sara Lee's motion for summary judgment as to LCC's claims under the NJFPA will be denied.

### 3. Negligent Misrepresentation

Sara Lee has moved for summary judgment on LCC's claims of negligent misrepresentation on the grounds that New Jersey law precludes tort liability for economic loss arising out of a commercial transaction and, alternatively, that it was unreasonable for LCC to rely on Sara Lee's alleged statements. I conclude that LCC's claims of negligent misrepresentation are barred by the economic loss doctrine which generally limits recovery for defective goods to remedies provided by the Uniform Commercial Code ("U.C.C."). Consequently, Sara Lee's motion for summary judgment will be granted as to LCC's claims of negligent misrepresentation.

In *Spring Motors Distributors, Inc. v. Ford Motor Co.,* 98 N.J. 555, 489 A.2d 660 (1985), the New Jersey Supreme Court held that "a commercial buyer seeking damages for economic loss resulting from the purchase of defective goods may recover from an immediate seller and a remote supplier in a distributive chain for breach of warranty under the U.C.C., but not in strict liability or negligence." *Id.* at 561, 489 A.2d 660. The court premised this conclusion on the distinction between tort law and contract law, concluding that, "[a]s among commercial parties in a direct chain of distribution, contract law,

expressed here though the U.C.C., provides the more appropriate system for adjudicating disputes arising from frustrated economic expectations." *Id.* at 580, 489 A.2d 660.

In the wake of *Spring Motors,* courts in New Jersey have struggled with the viability of fraud claims to recover for economic loss arising out of commercial transactions under the U.C.C. *See, e.g., Vanguard Telecommunications, Inc. v. Southern New England Telephone Co.,* 900 F.2d 645, 654 (3d Cir. 1990) (recognizing the "very complex and troublesome" issue, but "declin[ing] to wade into this morass"); *compare, e.g., Unifoil Corp. v. Cheque Printers & Encoders Ltd.,* 622 F.Supp. 268, 271 (D.N.J.1985) (interpreting *Spring Motors* to bar claims of fraud in the performance of a contract, but not fraud in the inducement), *with Coastal Group, Inc. v. Dryvit Systems, Inc.,* 274 N.J.Super. 171, 178, 643 A.2d 649 (App.Div.1994) (finding that *Unifoil* was "based on an overly expansive reading of *Spring Motors* ").

Courts in New Jersey have generally agreed, however, that only intentional torts are actionable under *Spring Motors* and have dismissed claims of negligent misrepresentation on that basis. *See Hoke, Inc. v. Cullinet Software, Inc.,* 1992 WL 102715, \*2 (D.N.J. Mar. 18, 1992) ("[T]he court is convinced that under New Jersey law, the *Spring Motors* holding would extend to bar tort suits for negligent misrepresentations inducing the formation of contracts between commercial parties."); *see also Henry Heide, Inc. v. WRH Products Co., Inc.,* 766 F.2d 105, 109 (3d Cir.1985) (dismissing claim of negligent misrepresentation and reasoning that "[b]ecause this claim arises out of a sales transaction between commercial entities, it should be analyzed within the framework of the U.C.C. rather than by the rules of *nonintentional* tort law.") (emphasis added); *Unifoil Corp.,* 622 F.Supp. at 271 (dismissing claim of negligent misrepresentation under *Spring Motors*).

In a recent decision overlooked by both parties, the New Jersey Supreme Court clarified the test for which claims are barred by *Spring Motors. See Alloway v. General Marine Industries, L.P.,* 149 N.J. 620, 695 A.2d 264 (1997) (reiterating generally that "a tort

cause of action for economic loss duplicating the one provided by the U.C.C. is superfluous and counterproductive").[11] The court explained that the fundamental distinction between permissible and impermissible claims lies in the object of the damage: "[g]enerally speaking, tort principles are better suited to resolve claims for personal injuries or damage to other property" while "[c]ontract principles more readily respond to claims for economic loss caused by damage to the product itself." See id. at 627, 695 A.2d 264 (noting also that "[i]mplicit in the distinction is the doctrine that a tort duty of care protects against the risk of accidental harm and a contractual duty preserves the satisfaction of consensual obligations").[12]

Thus, in New Jersey, the U.C.C. provides "the exclusive remedy for claims of purely economic loss due to a defective product." Goldson v. Carver Boat Corp., 309 N.J.Super. 384, 395, 707 A.2d 193 (App.Div.1998) (characterizing Alloway as holding that "where the harm suffered is to the product itself, unaccompanied by personal injury or property damage ... principles of contract, rather than of tort law, are better suited to resolve the purchaser's claim") (quotation and alterations omitted); see Alloway, 149 N.J. at 629, 695 A.2d 264 ("The U.C.C. represents the Legislature's attempt to strike the proper balance in the allocation of the risk of loss between manufacturers and purchasers for economic loss arising from injury to a defective product."). Thus, the Goldson court

concluded that where "there is no substantial disparity in bargaining power, and the only damage caused by the defective product is to the product itself, contract law, and the law of warranty in particular, is best suited to set the metes and bounds of appropriate remedies." Goldson, 309 N.J.Super. at 397, 707 A.2d 193. Because LCC seeks to recover in tort for defective products and their economic consequences, not for damage to persons or to other property, I find that LCC's negligent misrepresentation claim is barred by New Jersey's economic loss doctrine.

Moreover, the Appellate Division explained that, while breach of warranty damages are "designed to place the purchaser in as good a position as he would have been in had the product performed as warranted ... tort damages generally compensate the plaintiff for loss and return him to the position he occupied before the injury." Id. at 397, 707 A.2d 193 (quotation omitted). LCC seeks to recover lost profits, which would place it in the position it would have been in had Sara Lee performed the contract rather than the position it occupied before the alleged breach. This perspective also compels my conclusion that LCC's claims of negligent misrepresentation are barred by the economic loss doctrine.

LCC contends, however, that the economic loss doctrine does not apply because LCC lacked substantially equal bargaining power.[13] The New Jersey Supreme Court has

11. The court defined economic loss as encompassing "actions for the recovery of damages for costs of repair, replacement of defective goods, inadequate value, and consequential loss of profits" as well as "the diminution of value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." Id. at 627, 695 A.2d 264 (quotation omitted).

12. LCC contends that Sara Lee's negligent misrepresentations "were not intended to be excluded from the parties' contract." See LCC's Mem. at 36. Interpreting this as an invocation of the rule permitting claims of fraudulent inducement based on statements "contained in the actual contract" but not on statements "which are extraneous to the contract," see Werner & Pfleiderer Corp. v. Gary Chemical Corp., 697 F.Supp. 808, 815–16 (D.N.J.1988), overruled by Lo Bosco v. Kure Engineering, Ltd., 891 F.Supp. 1020, 1032–33 (D.N.J.1995), to the extent that this distinction

survived Lo Bosco, that rule has been superseded by the reasoning of the New Jersey Supreme Court in Alloway.

13. Despite the passage of years, courts in New Jersey remain unable to decide whether the existence of substantially equal bargaining power is a question of law for the court or a question of fact for the jury. See Fleming Companies, Inc. v. Thriftway Medford Lakes, Inc., 913 F.Supp. 837, 845 (D.N.J.1995) (finding both that "[u]nconscionability is a question of law to be determined by the court" and that, "[w]here no genuine issue of material fact exists, a court may conclude on a motion for summary judgment that a contract is enforceable despite an allegation of unconscionability"); compare Monsanto Co. v. Alden Leeds, Inc., 130 N.J.Super. 245, 253, 326 A.2d 90 (Law Div.1974) (finding that "unconscionability is a matter of law to be determined by the court, without a jury") with Lomonaco v. Sands Hotel Casino & Country Club, 259 N.J.Super. 523, 531–

determined that "[p]erfect parity is not required for a finding of substantially equal bargaining power." *Alloway*, 149 N.J. at 628, 695 A.2d 264. Thus, "[a]lthough a manufacturer may be in a better position to absorb the risk of loss from physical injury or property damage, a purchaser may be better situated to absorb the risk of economic loss caused by the purchase of a defective product." *Id.* (quotation omitted).

In *Spring Motors*, the court found that the plaintiff had substantially equal bargaining power in its purchase of trucks from the defendant because the plaintiff was able to persuade the defendant to install certain transmissions in the trucks. *See Spring Motors*, 98 N.J. at 576, 489 A.2d 660 (citing *Moreira Construction Co. v. Moretrench Corp.*, 97 N.J.Super. 391, 394–95, 235 A.2d 211 (App.Div.1967), where the court refused to invalidate a contractual limitation of liability on the basis of a gross inequality of bargaining power because, "[a]lthough plaintiff ... is obviously a small corporation, its owner has been engaged in the construction business for 18 years"); *cf. Regents of the University of Minnesota v. Chief Industries, Inc.*, 106 F.3d 1409, 1412 (8th Cir.1997) ("A plaintiff who regularly buys and sells goods of the kind will in all likelihood have such knowledge and sophistication, but so may a similarly knowledgeable party who is not a dealer.") (interpreting the economic loss doctrine under Minnesota's version of the U.C.C.).

LCC cites no record evidence in support of its contention that it lacked substantially equal bargaining power. To the contrary, the record reflects a commercial transaction between sophisticated business entities involving arms-length negotiations. LCC's negligent misrepresentation claims arose from a contract in which Sara Lee agreed to supply LCC with the Mexican pantyhose in exchange for a release from LCC's potential claims. Specifically, LCC demanded concessions from Sara Lee to avoid litigation. *See, e.g.,* Letter from A. Vasys to J. Piazza (dated

Dec. 19, 1994) (emphasizing the mutual benefits of the distributorship arrangement, requesting assistance and threatening that "the alternative may prove to be much costlier"). The diction and tone of LCC's own description of the transaction suggest arms-length negotiations leading to mutual consent:

> Throughout most of the first half of 1995, the principals of Defendants and Plaintiff engaged in protracted negotiations and discussions.... Ultimately, the parties settled upon a plan to resolve Plaintiff's claims when the Defendants offered to give to LCC, free of charge, [the Mexican pantyhose]. The Plaintiff was, however, obligated to pay the transportation costs associated with shipping the Mexican-made pantyhose to Lithuania. The settlement agreement between the parties is contained in a letter dated July 7, 1995.

Joint Final Pre-trial Order, Statement of Facts which LCC Intends to Prove with Regard to Liability at ¶¶ 32–33; *see* Vasys Aff. I at ¶ 14.

Because it is undisputed that LCC made demands and received concessions, and because of the undisputed nature of this transaction, I conclude that LCC has not established that it lacked substantially equal bargaining power. Consequently, Sara Lee's motion for summary judgment will be granted as to LCC's claims of negligent misrepresentation.

### 4. Common Law Fraud

Sara Lee has moved for summary judgment on LCC's claims of common law fraud on the grounds that LCC has provided no evidence of Sara Lee's intent to deceive LCC and that it was unreasonable for LCC to have relied upon Sara Lee's representations. For the reasons set forth below, Sara Lee's motion will be denied as to these claims.

In New Jersey, "[t]he five elements of common-law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the

32, 614 A.2d 634 (Law Div.1992) (finding that "there are genuine issues of material fact which ... may allow a finder of fact to conclude that the circumstances surrounding plaintiff's entering in to the contracts for credit were such as to

render the contracts void or voidable due to ... unconscionability"). Because no material facts are in dispute here, however, I may decide the issue as a matter of law without resolving this conflict.

defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 610, 691 A.2d 350 (1997) (citing *Jewish Center of Sussex County v. Whale,* 86 N.J. 619, 624–25, 432 A.2d 521 (1981)). LCC alleges that Sara Lee fraudulently represented that the Mexican pantyhose were equivalent to American pantyhose and fraudulently withheld the results of a marketing survey conducted by Sara Lee.

### a. Pantyhose Specifications

■ LCC alleges that employees of Sara Lee represented to Vasys that the specifications of the Mexican pantyhose were identical to those of their American counterparts. Sara Lee contends that there is no evidence that it knew or believed such statements to be false, and that LCC has thereby failed to substantiate the second element of its claim. "It is usually inappropriate to resolve matters of intent, which, by their nature, often involve credibility determinations, on a paper record." *See Franklin Building Corp. v. City of Ocean City,* 946 F.Supp. 1161, 1169 (D.N.J.1996). In this case, the record contains sufficient evidence to support a jury's finding that Sara Lee knew that its statements were false. Thus, summary judgment is inappropriate.

For example, there is evidence in the record from which a reasonable fact-finder could infer that the specifications of the Mexican pantyhose were not the same, *see* Transcript of *Daubert* Hearing before Hon. Joel B. Rosen, U.S. Magistrate Judge (dated Sept. 25, 1997) at 36 (Sara Lee's own expert witness testified that "they are different in terms of specification"); *see also* Deposition Transcript of Tushar K. Ghosh, Ph.D. (dated June 20, 1997) at 172, and that both sets of specifications were in Sara Lee's possession, *see* Deposition Transcript of Herve Roche (dated Dec. 18, 1996) at 124. Consequently, I find that genuine issues of material fact exist as to Sara Lee's knowledge of the veracity of its statements.

Sara Lee contends, however, that LCC's reliance on Sara Lee's allegedly false statement was not reasonable. "One of the essential elements of a cause of action for fraud is reliance and a plaintiff must demonstrate that reliance upon any representation was justified and reasonable." *Fleming Companies, Inc. v. Thriftway Medford Lakes, Inc.,* 913 F.Supp. 837, 844 (D.N.J.1995) (citing *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 189 N.J.Super. 347, 355, 460 A.2d 161 (App.Div.1983), *aff'd in part and rev'd in part,* 97 N.J. 37, 477 A.2d 1224 (1984)). I conclude that the reasonableness of LCC's reliance remains a disputed issue of fact precluding summary judgment on this issue.

Although "[t]he nature and extent of the reliance required is subject to debate," *see United Jersey Bank v. Wolosoff,* 196 N.J.Super. 553, 564, 483 A.2d 821 (App.Div.1984), the parties have not addressed the appropriate standard by which to judge LCC's alleged reliance. In an oft-cited comment, the Second Restatement of the Law of Torts describes the reasonableness generally required by the reliance element of common law fraud:

Although the recipient of a fraudulent misrepresentation is not barred from recovery because he could have discovered its falsity if he had shown his distrust of the maker's honesty by investigating its truth, he is nonetheless required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses.

Restatement (Second) of Torts § 541 cmt. a (1977).

In this case, LCC has provided evidence which, making all reasonable inferences in its favor, could support a finding that a reasonable inspection would not have detected the defects in the Mexican pantyhose. *See* Mizelle Dep. at 223–24 (testifying that "the inspection process is visual and it's subject to human error" and that such "was a fact in the industry"); *see also* Report of Bernard Miller, Ph.D. (dated Aug. 14, 1997) (describing and comparing the Mexican and American pantyhose). Thus, a jury could find that LCC lacked "ample opportunity to ascertain the truth of the representations." *See Fleming Companies,* 913 F.Supp. at 844 (quoting *Nappe,* 189 N.J.Super. at 355–56, 460 A.2d 161). Accordingly, I find that a genuine issue of material fact remains as to whether a reasonable inspection would have revealed the defects in the Mexican pantyhose.

Where a fraud plaintiff has investigated the alleged misrepresentation, some New Jersey decisions have specifically required a plaintiff to prove that it "relied on the result of this investigation and not on the alleged assurances of [the defendants]." *See Byrne v. Weichert Realtors,* 290 N.J.Super. 126, 137, 675 A.2d 235 (App.Div.1996) (citing *Golden v. Northwestern Mutual Life Insurance Co.,* 229 N.J.Super. 405, 415, 551 A.2d 1009 (App.Div.1988)), *certif. denied,* 147 N.J. 259, 686 A.2d 761 (1996); *see also Simpson v. Widger,* 311 N.J.Super. 379, 392–93, 709 A.2d 1366 (App.Div.1998). *But see DSK Enterprises, Inc. v. United Jersey Bank,* 189 N.J.Super. 242, 251, 459 A.2d 1201 (App.Div.) (holding that "if a party to whom representations are made nevertheless chooses to investigate the relevant state of facts for himself, he will be deemed to have relied on his own investigation and will be charged with knowledge of whatever he could have discovered by a reasonable investigation"), *certif. denied,* 94 N.J. 598, 468 A.2d 232 (1983). I need not resolve this conflict, however, because even under the more exacting standard, LCC has raised a genuine issue of fact. *See* Vasys Aff. I at ¶ 16 (averring that "LCC relied in good faith on ... the representations, promises and assurances made by Peter L. Hellebush on behalf of Sara Lee Hosiery that ... the specifications for the [Mexican pantyhose] would be exactly the same as the L'eggs pantyhose manufactured in the United States.").

Although New Jersey courts have failed to reach a consensus on the appropriate standard for reliance on a fraudulent misrepresentation, I find that there exists a genuine issue of material fact under any of the articulated standards. Accordingly, Sara Lee's motion for summary judgment will be denied as to LCC's fraud claims premised upon alleged misrepresentations concerning the specifications of the Mexican pantyhose.

### b. Survey Results

■ LCC also claims that Sara Lee fraudulently failed to inform LCC of the negative results of a marketing survey concerning the Mexican pantyhose. *See* Report of a Survey: L'eggs Profile, Usage and Valuation (dated Jan. 1995). Sara Lee denies that it had a duty to disclose this information to LCC. Whether Sara Lee had such a duty is a question of law to be decided by the Court. *See United Jersey Bank v. Kensey,* 306 N.J.Super. 540, 551, 704 A.2d 38 (App. Div.1997) (citing *Carter Lincoln–Mercury, Inc. v. EMAR Group, Inc.,* 135 N.J. 182, 194, 638 A.2d 1288, (1994)), *certif. denied,* 153 N.J. 402, 709 A.2d 795 (1998). "The question is one of fairness and policy that 'involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.'" *Kensey,* 306 N.J.Super. at 551, 704 A.2d 38 (quoting *Hopkins v. Fox & Lazo Realtors,* 132 N.J. 426, 439, 625 A.2d 1110 (1993)).

In *Kensey,* the court provided a comprehensive review of this disclosure doctrine. The court noted that a duty to disclose arises in only three general classes of transactions: (1) transactions involving fiduciary relationships; (2) transactions which are "intrinsically fiduciary;" and (3) transactions in which one or both parties expressly reposes a trust and confidence in the other, or in which such trust and confidence is implicit. *See Kensey,* 306 N.J.Super. at 551, 704 A.2d 38; *accord Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1185 (3d Cir.1993). Because no fiducia-

ry relationships are involved in this transaction, only the last category could apply.

New Jersey has recognized "the growing trend to impose a duty to disclose in many circumstances in which silence historically sufficed," and has adopted the reasoning of the Second Restatement of the Law of Torts. *See Kensey,* 306 N.J.Super. at 553–54, 704 A.2d 38 (citing *Strawn v. Canuso,* 140 N.J. 43, 60–61, 657 A.2d 420 (1995)). The Restatement requires a party to disclose to another party "facts basic to the transaction, if he knows that the other is about to enter into it under a mistake ... and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts." Restatement (Second) of Torts § 551(2) (1977). Because of the difficulty in determining or identifying the factors that would give rise to an expectation of disclosure, however, the Restatement envisions only a situation where the failure to disclose is "so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling...." *Id.* § 551(2) cmt. 1; *see Kensey,* 306 N.J.Super. at 554, 704 A.2d 38 (affirming grant of summary judgment).

In this case, the omitted report does not directly indicate that the Mexican pantyhose are defective, but only reflects consumer dissatisfaction. I do not hold that indirect relevance can never satisfy the Restatement's test, but I find that, in this case, Sara Lee's failure to disclose this report to LCC in the context of their transaction is not "so shocking to the ethical sense of the community, [or] so extreme and unfair, as to amount to a form of swindling." Accordingly, Sara Lee's motion for summary judgment will be granted as to LCC's claim of fraud premised upon Sara Lee's failure to disclose the results of this survey.

### 5. Breach of Express Warranty

■ Sara Lee has moved for summary judgment on LCC's breach of express warranty claims. Sara Lee's arguments boil down to the contention that Sara Lee warranted only that the pantyhose would conform to the "samples" which were sent to LCC, and that the goods did conform to those samples. I find, however, that whether the samples actually became part of the basis of the bargain, and thereby a warranty, is a question of fact which precludes summary judgment at this point.

According to New Jersey's version of the Uniform Commercial Code, "[e]xpress warranties by the seller are created as follows:"

(a) Any affirmation of fact or promise made by the seller to the buyer *which* relates to the goods and *becomes part of the basis of the bargain* creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods *which is made part of the basis of the bargain* creates an express warranty that the goods shall conform to the description.

(c) Any sample or model *which is made part of the basis of the bargain* creates an express warranty that the whole of the goods shall conform to the sample or model.

N.J.S.A. 12A:2–313(1) (emphases added). Thus, neither Sara Lee's alleged misrepresentation regarding the specifications of the Mexican pantyhose, *see* N.J.S.A. 12A:2–313(1)(a), (b), nor the samples of Mexican pantyhose sent to LCC, *see* N.J.S.A. 12A:2–313(1)(c), were express warranties unless they were part of the basis of the bargain.

The Third Circuit, interpreting New Jersey law, reconciled the "part of a basis of the bargain" language with "the U.C.C. comments, the U.C.C. case law, and traditional contract principles" in *Cipollone v. Liggett Group, Inc.,* 893 F.2d 541 (3d Cir.1990), *aff'd in part and rev'd in part,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Writing for the court, Judge Becker summarized: "We hold that once the buyer has become aware of the affirmation of fact or promise, the statements are presumed to be part of the 'basis of the bargain' unless the defendant, by 'clear affirmative proof,' shows that they buyer knew that the affirmation of fact or promise was untrue." *Id.* at 568.

Here, LCC has presented evidence that Hellebush told Vasys that the Mexican pantyhose would have the same specifications as their American counterparts. *See, e.g.,*

Vasys Aff. I at ¶ 16. Those statements are thus presumed to be part of the basis of the bargain. *See Cipollone,* 893 F.2d at 568; *see also id.* at 567 n. 29 (stating that in the case of "an oral affirmation of fact or promise made to the purchaser in person by the seller . . . there is no question that the plaintiff has knowledge that the alleged warranty exists"). Sara Lee, in turn, has presented evidence which could support a finding that LCC knew the statements were untrue. *See, e.g.,* Letter from I. Maldonado to A. Vasys (dated Jul. 3, 1995) (enclosing English translations of "the pantyhose colors and the printed material of the l'eggs [sic] packages"). At least in this circuit, such a stand-off does not entitle either side to summary judgment. *See Cipollone,* 893 F.2d at 568; *see also International Paper Co. v. Farrar,* 102 N.M. 739, 700 P.2d 642, 646 (1985) (finding that U.C.C. § 2–313(1)(c) could not provide a defense to a claim of breach of express warranty where the samples were not the basis of the bargain); *Plastireal, S.A. v. Hirica USA, Ltd.,* 1990 WL 71441, *4 (S.D.N.Y. May 18, 1990) ("The primary question is, what did the parties intend, for there was no sale by sample unless the parties so intended.") (quotation omitted).

Sara Lee contends that the warranty created by the samples superseded any warranty created by Hellebush's statement because, where warranties conflict, "[a] sample from an existing bulk displaces inconsistent general language of description." *See* N.J.S.A. 12A:2–317(b). Even assuming that the samples were part of the basis of the bargain, however, that rule is merely "designed to aid in determining the intention of the parties as to which of inconsistent warranties which have arisen from the circumstances of their transaction shall prevail. . . . To the extent that the seller has led the buyer to believe that all of the warranties can be performed, he is estopped from setting up any essential inconsistency as a defense." *See* N.J.S.A. 12A:2–317 cmt. 2. Moreover, that rule is "not absolute but may be changed by evidence showing that the conditions which existed at the time of contracting make the construction called for by the section inconsistent or unreasonable." N.J.S.A. 12A:2–317 cmt. 3; *see also Stewart–Decatur Securi-*

*ty Systems, Inc. v. Von Weise Gear Co.,* 517 F.2d 1136, 1140 n. 12 (8th Cir.1975) (noting that the drafters of the U.C.C. took "great pains" to so limit the rule). Thus, Sara Lee cannot rely on this provision to eliminate the existing issue of fact.

In a last ditch effort, Sara Lee contends that LCC failed to notify Sara Lee of the defects in the Mexican pantyhose within a reasonable time. In New Jersey, "[w]here a tender has been accepted, the buyer must within a reasonable time after he discovers or should have discovered any breach, notify the seller of a breach or be barred from any remedy." N.J.S.A. 12A:2–607(3)(a). Under the U.C.C., "[w]hat is a reasonable time for taking any action depends on the nature, purpose, and circumstances of such action." *See* N.J.S.A. 12A:1–204(2). I note, however, that this notice restriction "is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy." *See* N.J.S.A. 12A:1–204 cmt. 4. I note also that courts should consider whether the defendant was prejudiced by the lack of notice. *See Cipollone v. Liggett Group, Inc.,* 683 F.Supp. 1487, 1498 n. 14 (D.N.J.1988).

Sara Lee's argument has no merit. I have already determined that a jury question exists as to whether LCC should have discovered the defects from its examination of the samples. *See supra* Part II.C.4.a. Moreover, on the record before me, I cannot determine that LCC's four month delay was unreasonable as a matter of law. *See* N.J.S.A. 12A:1–204(2) (defining the reasonable time for acting in terms of "the nature, purpose, and circumstances" of the action); *compare* Vasys Aff. I at ¶ 21 (indicating that LCC received the Mexican pantyhose in mid-August of 1995) *with* Letter from A. Vasys to P. Hellebush (dated Dec. 15, 1995) (notifying Sara Lee of defects). Finally, Sara Lee has presented no evidence that it was prejudiced by any delay. Accordingly, Sara Lee's motion for summary judgment will be denied as to LCC's claims that Sara Lee breached an express warranty.

**6. Breach of Implied Warranties**

■ Sara Lee has moved for summary judgment on LCC's claims that Sara Lee

breached the implied warranty of merchantability and the implied warranty of fitness for a particular purpose. Once again, Sara Lee relies on LCC's opportunity to inspect the samples of Mexican pantyhose and, once again, I conclude that this creates a genuine issue of material fact precluding summary judgment.

In every sale of goods to a merchant, New Jersey law implies "a warranty that the goods shall be merchantable." *See* N.J.S.A. 12A:2–314; *see also* N.J.S.A. 12A:2–314(2)(c) (defining "merchantable" as "fit for the ordinary purposes for which such goods are used"). Where the seller "has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods," New Jersey law also implies a warranty "that the goods shall be fit for such purpose." *See* N.J.S.A. 12A:2–315.

Sara Lee points to the statutory exemption from these warranties based upon the buyer's inspection of a sample. New Jersey law provides:

> when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty *with regards to defects which an examination ought in the circumstances to have revealed to him.*

N.J.S.A. 12A:2–316(3)(b) (emphasis added). I have already determined that an issue of fact remains as to whether an inspection of the sample Mexican pantyhose ought to have revealed their defects. *See supra* Part II. C.4.a; *see also Henry Heide, Inc. v. WRH Products Co., Inc.*, 766 F.2d 105, 110–11 (3d Cir.1985) (vacating summary judgment because a breach of implied warranty claim is only barred "against anyone who was responsible for a defect that the buyer ought, in the circumstances, to have noticed" and because "we cannot determine at this procedural stage whether the defect in the [product] ought to have been revealed in the testing of the second sample"). Accordingly, Sara Lee's motion for summary judgment will be denied as to LCC's claims that Sara Lee breached its implied warranties.

### 7. Breach of Contract and of the Duty of Good Faith and Fair Dealing

Sara Lee contends that LCC cannot maintain its claims of breach of contract and breach of the duty of good faith and fair dealing because the distributorship agreement is not an enforceable contract. LCC disputes that assertion, and also maintains that these contract claims rest on the settlement agreement as well as the distributorship agreement. I find that LCC's distributorship agreement satisfies the requirements of New Jersey law as an enforceable contract. I further find that LCC has alleged claims of breach of contract and breach of the duty of good faith and fair dealing with respect to the settlement agreement.

#### a. The Distributorship Agreement

■ Sara Lee contends that no legally enforceable contract for distribution was ever formed because the parties did not "agree on essential terms and manifest an intention to be bound by these terms" as required by the common law of contracts. *See Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 434, 608 A.2d 280 (1992). The general principles of contract law relied upon by Sara Lee, however, are somewhat relaxed in this scenario. "Despite indefinite terms in a contract, an exclusive sales and distribution contract may be found to exist between two parties." *Gilette Foods, Inc. v. Bayernwald–Fruchterverwertung*, 1988 WL 47608, *3 (D.N.J. May 10, 1988) (citing *Mantell v. International Plastic Harmonica Corp.*, 141 N.J.Eq. 379, 389, 55 A.2d 250 (1947)); *see also Jo–Ann, Inc. v. Alfin Fragrances, Inc.*, 731 F.Supp. 149, 157 (D.N.J.1989) ("I do not believe that the omission of material terms in any way affects the contract's validity under the statute of frauds. This is particularly apt for terms such as the price and quantity of goods in an exclusive distributorship agreement.") (citing *Mantell*).

In New Jersey, distributorship agreements are generally subject to the provisions of the U.C.C. *See Custom Communications Engineering, Inc. v. E.F. Johnson Co.*, 269 N.J.Super. 531, 538–39, 636 A.2d 80 (App. Div.1993). Notwithstanding the common law

of contracts, under the U.C.C., "[a] contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." *See* N.J.S.A. 12A:2–204(1). New Jersey law specifically provides that, "[e]ven though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." *See* N.J.S.A. 12A:2–204(3).

In *Mantell,* the New Jersey Court of Errors and Appeals upheld the validity of an exclusive distributorship agreement despite the absence of specific price and quantity terms. In essence, the court established a separate standard for distributorship contracts:

> This type of contract is a comparatively recent device to meet modern needs in the marketing and distribution of goods on a nation-wide or regional scale. In the very nature of the exclusive sales and distribution contract, it is not usually practicable to fix prices and the quantum of goods sold; and the rules of certainty and definiteness which govern the ordinary contract of sale have no application. Unlike a pure contract of purchase and sale, agreements of this class embody mutual promises and obligations with sufficiently definite standards by which performance can be tested. The grant of the exclusive franchise is a consideration for the grantee's obligation to establish and develop a market for the sale and distribution of the product in the area covered by the monopoly. The character of the contractual arrangement is such as to preclude explicitness as to quantity and prices. This is especially so where, as here, the product is new and untried and its potential worth and market value and the cost of manufacture and distribution are unknown quantities. Such contracts have the requisite mutual assent and consideration. They are not comparable to the ordinary executory agreement to buy and sell goods.

*Mantell,* 141 N.J.Eq. at 389, 55 A.2d 250. Thus, the court concluded that "[c]ontracts of this category are to be given a practical interpretation that will effectuate and not defeat the common intention in an area of conventional action that, due to unpredictable market conditions, production factors, and so on, ordinarily does not permit of greater certainty and definiteness in the particulars mentioned." *Id.*

This decision, although rendered in 1947, was incorporated into New Jersey's version of the U.C.C. *See* N.J.S.A. 12A:2–204 N.J. cmt. (stating that the statutory provision is "in line with the important case of" *Mantell* and observing that *Mantell* "took a dim view of the defense of lack of definiteness where commercial contracts are involved"); *see also Graulich Caterer Inc. v. Hans Holterbosch, Inc.,* 101 N.J.Super. 61, 71–72, 243 A.2d 253 (App.Div.1968). This is consistent with the U.C.C. comment which clarifies that "commercial standards on the point of 'indefiniteness' are intended to be applied, this Act making provision elsewhere for missing terms needed for performance, open price, remedies and the like." N.J.S.A. 12A:2–204 U.C.C. cmt. Thus, although a more open-ended agreement is less likely to be enforceable, the parties' actions nonetheless "may be frequently conclusive on the matter despite the omissions." *See id.*

In this case, LCC has provided sufficient evidence for a reasonable jury to conclude that LCC had a contractual agreement with Sara Lee under New Jersey law. Vasys avers that "Sara Lee verbally granted to LCC, on a trial basis, a distributorship for the L'eggs brand pantyhose" and "[u]nder the distributor agreement, LCC was required to promote both sales of Sara Lee's L'eggs pantyhose products and Sara Lee's trade names and trademarks," dedicate at least one delivery van to L'eggs products and advertise and market L'eggs and Sara Lee products. *See* Vasys Aff. I at ¶ 4; *id.* at ¶¶ 5–10; *see also* Stip. F. at ¶ 17 ("Sara Lee agreed to reimburse LCC for 50 percent of its advertising costs, up to 10% of its purchases, within its territory."); Letter from Vereen Mizelle to whom it may concern (notarized Sept. 7, 1994); Letter from Vereen Mizelle to whom it may concern (notarized Aug. 23, 1995). Accordingly, Sara Lee's mo-

tion for summary judgment will be denied as to LCC's claims of breach of contract and breach of the duty of good faith and fair dealing arising out of the distributorship agreement.

### b. The Settlement Agreement

■ Sara Lee interprets Count Nine of LCC's Amended Complaint alleging breach of contract to be "solely premised upon a purported 'Distributorship Agreement' between Sara Lee and LCC." *See* Sara Lee's Mem. at 47. LCC contends, however, that Count Nine also "encompasses claims for Sara Lee's breach of the July 7, 1995 settlement agreement." *See* LCC's Mem. at 49.[14] I find that LCC has pled a breach of contract claim, and a claim of breach of the duty of good faith and fair dealing, with respect to the settlement agreement.

Sara Lee points out that LCC patently omitted any mention of the settlement agreement in Count Nine of the Amended Complaint. The Joint Final Pre-trial Order, however, incorporates a claim by LCC for "the shipment by [Sara Lee] to LCC of nonconforming and defective goods." *See* Joint Final Pre-trial Order, Summary of Plaintiff's Claims at cl. 3. Therefore, I find that LCC has set forth a claim of breach of contract premised upon the settlement agreement. *See* Fed.R.Civ.P. 16(e) ("The [Joint Final Pre-trial] order shall control the subsequent course of the action unless modified by a subsequent order."); *Wilson v. Kelkhoff,* 86 F.3d 1438, 1442 (7th Cir.1996) (noting that "the pre-trial order is treated as superseding the pleadings and establishes the issues to be considered at trial" and finding that claims were properly before the court where the pre-trial order "did not clearly frame" the claims but "include[d] sufficient references" to them).

LCC has also pled a claim of breach of the implied duty of good faith and fair dealing. *See* Compl. at ¶ 138 (alleging that Sara Lee breached the duty of good faith and fair dealing by, among other things, "failing to disclose the true specifications and quality of the product to be shipped to Plaintiff from Mexico"). Given that a covenant of good faith and fair dealing is implied in every contract in New Jersey, the Joint Final Pre-trial Order adequately preserves this claim. *See Sons of Thunder, Inc. v. Borden, Inc.,* 148 N.J. 396, 420, 690 A.2d 575 (1997); *see also Peck v. Imedia, Inc.,* 293 N.J.Super. 151, 168, 679 A.2d 745 (App.Div.) ("In the absence of a contract, there is no implied covenant of good faith and fair dealing."), *certif. denied,* 147 N.J. 262, 686 A.2d 763 (1996). Accordingly, with respect to the settlement agreement, Sara Lee's motion for summary judgment will be denied as to LCC's breach of contract claims and as to LCC's claims that Sara Lee breached the duty of good faith and fair dealing.

### 8. Tortious Interference with Business Relations

■ Sara Lee has moved for summary judgment on LCC's claims of tortious interference with its existing contracts and with its prospective business advantage. "The Supreme Court of New Jersey has identified the four elements of a prima facie case for this tort: (1) a reasonable expectation of economic advantage to plaintiff, (2) interference done intentionally and with 'malice,' (3) causal connection between the interference and the loss of prospective gain, and (4) actual damages." *Varrallo v. Hammond, Inc.,* 94 F.3d 842, 848 (3d Cir.1996) (citing *Printing Mart–Morristown v. Sharp Electronics Corp.,* 116 N.J. 739, 563 A.2d 31 (1989)). In addition, some panels of the Third Circuit have recognized the defendant's knowledge of the expected advantage

14. Counsel for both Sara Lee and LCC, in characteristic fashion, have submitted briefs of 55 and 56 pages respectively in violation of this Court's requirement that briefs shall not exceed 40 pages in length. *See* L. Civ. R. 7.2(b). The conduct of counsel throughout this matter has at times been alarming, *see, e.g., Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery,* 177 F.R.D. 245, 267 (D.N.J.1997), and has even resulted in the imposition of sanctions, *see, e.g., Lithuanian*

*Commerce Corp., Ltd. v. Sara Lee Hosiery,* 177 F.R.D. 205 (D.N.J.1997). As this litigation continues, the Court is everhopeful that all involved will conform their conduct to the Local Civil Rules of this Court, as well as the Federal Rules of Civil Procedure and the applicable rules of professional conduct. Indeed, I insist that counsel scrupulously discharge their obligations to the Court.

as a fifth element. *See Varrallo,* 94 F.3d at 848 n. 9 (citing *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1167 (3d Cir.1993)); *see also Federal Deposit Insurance Corp. v. Bathgate,* 27 F.3d 850, 871–72 (3d Cir.1994).

█ Sara Lee contends that LCC has failed to offer any evidence from which a jury could reasonably infer knowledge, intent or malice. The New Jersey Supreme Court has clarified the requisite showing:

> For purposes of this tort, "[t]he term malice is not used in the literal sense requiring ill will toward the plaintiff." Rather, malice is defined to mean that the harm was inflicted intentionally and without justification or excuse.

*Printing Mart–Morristown,* 116 N.J. at 751, 563 A.2d 31 (quoting Restatement (Second) of Torts ch. 37, intro. note).

█ In this case, the nature of the relationship between Sara Lee and LCC is sufficient to give rise to a permissible inference that Sara Lee knew of LCC's existing and prospective business relationships, and knew of the effect that defective goods would have on them. *See, e.g.,* Vasys Aff. I at ¶ 19 (relating Sara Lee's recognition of LCC's "dedicated efforts to expand Sara Lee Hosiery business in your marketplace"). The relationship was, in essence, about LCC selling Sara Lee pantyhose. I cannot rule, as a matter of law, that Sara Lee did not know that supplying defective pantyhose would interfere with LCC's business relationships. Moreover, the record contains evidence of specific motive, *see, e.g.,* Mizelle Dep. at 204 (testifying that Roche needed to dispose of the inventory of Mexican pantyhose by the end of the fiscal year for tax and accounting purposes), and even of conventional malice, *see, e.g., id.* at 272–73 (testifying that Roche said, in reference to Vasys, "f—k him" and "I don't give a s—t about him") (expletives altered).

Finally, there is abundant evidence that Sara Lee knew of LCC's ongoing efforts to expand its customer base. *See, e.g.,* Affidavit of Vereen Mizelle (dated May 2, 1996) at ¶ 4

(noting that LCC had always "provid[ed] information about LCC's marketing and advertising activities"); Mizelle Dep. at 199 ("I thought we [Sara Lee and LCC] were in the business of building markets."). Given that questions of intent are rarely appropriate for summary determinations, *see Franklin Building Corp. v. City of Ocean City,* 946 F.Supp. 1161, 1169 (D.N.J.1996), Sara Lee's motion for summary judgment will be denied as to LCC's claims of tortious interference with contracts and with prospective economic advantage.

### 9. Lanham Act

Sara Lee has moved for summary judgment on LCC's claims of false advertising under the Lanham Act. *See* 15 U.S.C. § 1125(a). Sara Lee contends that LCC's claims must fail because: (1) Sara Lee's allegedly actionable statements were not made in commercial advertising or promotion; and (2) LCC is not a competitor. LCC concedes that summary judgment is appropriate on this issue. *See* LCC's Mem. at 55.[15] The Court agrees. *See Serbin v. Ziebart International Corp., Inc.,* 11 F.3d 1163 (3d Cir. 1993); *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d 914 (3d Cir.), *cert. denied,* 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990). Accordingly, Sara Lee's motion for summary judgment will be granted as to LCC's claims under the Lanham Act.

### D. Summary Judgment Conclusion

For the reasons set forth above, LCC's motion for partial summary judgment will be denied and Sara Lee's motion for summary judgment will be granted in part and denied in part. The Court will enter an appropriate Order.

### ORDER

This matter having come before the Court on an appeal by Sara Lee Hosiery, Sara Lee Hosiery International, Sara Lee International and Sara Lee Corporation (collectively "Sara Lee") from a ruling by the Honorable

---

15. Apparently realizing that what is good for the goose is good for the gander, LCC contends that Sara Lee may not pursue its counterclaim under the Lanham Act because Sara Lee is not, by admission, a commercial competitor. This issue, however, is not before the Court at this time.

Joel B. Rosen, United States Magistrate Judge, denying Sara Lee's motion in limine to exclude evidence pertaining to the economic analysis of Charles J. Cummiskey and the wear tests conducted by Elona Skleriute and Nijole Rackiene, on the motion of Lithuanian Commerce Corporation, Ltd. ("LCC"), for partial summary judgment and on the cross-motion of Sara Lee for summary judgment; and,

Gregory D. Saputelli, Esq. and James R. Thompson, Esq., Obermayer, Rebmann, Maxwell & Hippel, appearing on behalf of LCC, and Diane E. Brehm, Esq., Carl W. Hittinger, Esq. and Lance Lewis, Esq., Ballard, Spahr, Andrews & Ingersoll, appearing on behalf of Sara Lee; and,

The Court having considered the submissions of the parties, for the reasons set forth in the Court's OPINION, filed concurrently with this ORDER;

IT IS, on this 29th day of June, 1998, hereby ORDERED that:

1. Concerning the appeal of Sara Lee's Motion in limine:

   a. The Order of Judge Rosen granting in part and denying in part Sara Lee's motion in limine, filed December 4, 1997, is VACATED insofar as it denies Sara Lee's motion in limine to exclude the testimony of Charles J. Cummiskey and evidence pertaining to the wear tests conducted by Elona Skleriute and Nijole Rackiene; and,

   b. The Reference of Sara Lee's motion in limine to Judge Rosen, dated October 1, 1997, is WITHDRAWN with respect to the testimony of Charles J. Cummiskey and evidence pertaining to the wear tests conducted by Elona Skleriute and Nijole Rackiene; and,

   c. Sara Lee's motion in limine is GRANTED as to the testimony of Charles J. Cummiskey and evidence pertaining to the wear tests conducted by Elona Skleriute and Nijole Rackiene.

2. LCC's motion for partial summary judgment on its claim under the New Jersey Consumer Fraud Act is DENIED; and

3. Sara Lee's motion for summary judgment is:

   a. GRANTED on LCC's claims under the New Jersey Consumer Fraud Act; and,

   b. DENIED on LCC's claims under the New Jersey Franchise Practices Act; and,

   c. GRANTED on LCC's claims of negligent misrepresentation; and,

   d. DENIED on LCC's claims of fraud premised upon Sara Lee's representations regarding the specifications of the Mexican pantyhose; and,

   e. GRANTED on LCC's claims of fraud premised upon Sara Lee's failure to disclose the results of the marketing survey; and,

   f. DENIED on LCC's claims that Sara Lee breached an express warranty; and,

   g. DENIED on LCC's claims that Sara Lee breached an implied warranty of merchantability and an implied warranty of fitness for a particular purpose; and,

   h. DENIED on LCC's claims of breach of contract and breach of the duty of good faith and fair dealing with respect to the distributorship agreement and to the settlement agreement; and,

   i. GRANTED on LCC's claims under the Lanham Act.